ANDREWS v. COMMISSIONER OF INTERNAL REVENUE (two cases).

RAINEY et al. v. SAME.

RAINEY v. SAME.

STODDARD v. SAME.

Nos. 114, 118, 115-117.

Circuit Court of Appeals, Second Circuit.

March 31, 1943.

Alexander S. Andrews, of New York City, for appellants.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Morton K. Rothschild, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

██ ██ Dickens reports that whenever Mr. Micawber renewed a note, he cheerfully remarked, "That's another debt paid." The world is full of Micawbers and of their creditors who are beguiled by their debtors' optimism. The courts are sometimes more cynical. Here, however, the bonds held by the taxpayers expressly provided that interest thereon might be "paid" in the debtor's "securities"; and the taxpayers, in receiving and retaining the scrip, although under protest, must be deemed to have taken it as "payment." To be sure, the scrip, by its terms, was subject to contingencies, and the facts before us make it indubitable that those contingencies could never have been satisfied, so that we know that the scrip could never be paid. Nevertheless, as Mr. Justice Jackson indicated when he was General Counsel of the Bureau of Internal Revenue, scrip accepted in payment of interest is taxable if it can be "readily disposed of for cash" and to "the extent of its fair market value."[4] Such a ruling is within § 22(a), 26 U.S.C.A. Int.Rev.Code, and Regulation 94, § 22(a) (1) reasonably provides that "income may be in the form of * * * property." If the property had an ascertainable money's worth in the taxable year, that worth must be included in gross income.[5] The questions here, then, are whether the scrip had money's worth and, if so, what was that worth.

To translate the word "worth" into the word "value" is of little help. "Value" is not a single purpose word.[6] Men have all but driven themselves mad in an effort to definitize its meaning. The problem arises in its most perplexing form when, as here, property has not in fact been sold and an effort is made to ascertain what it would have fetched if it had been sold. The answer is obviously a guess. Much cerebration has been wasted in the vain hope that some assemblage of some letters of the alphabet would eliminate the uncertainties inherent in such guessing. As we re-

cently said, the word "value" almost always "involves a conjecture, a guess, a prediction, a prophecy. * * * We cannot, by the use of a symbol, 'value,' convert the risky into risklessness, Canute restless change out of existence."[7] There is serious talk of "intrinsic" value, but the addition of that adjective merely adds to the confusion. What is the "intrinsic" value of a dozen gross of ladies' hats? It is futile, for tax purposes at any rate, to consider whether there are "intrinsic" economic values—"real" values—behind the "values" as they appear to mere man. Reading the discussions, one recalls the endless disputes of the philosophers about the "thing-in-itself."

Words are invaluable implements.[8] But they are merely perfected pointers, substitutes for the index finger. If you point a finger or a word at nothing, your pointing will not convert the nothing into something; talking of an eight-legged monkey with scales and fins will not bring such a quaint creature into existence; and if an object which you name is existent but vague, its vagueness will not vanish under the spell of the name no matter how precise.[9] We need, then, to pin down the idea behind the word "value" before we bother too much about the word itself. Indeed, "value," because of its troubled history, evokes such a multitude of conflicting associations that it might be well to abolish its use in legislation and judicial opinions. It would, perhaps, aid thinking to speak, instead, of "money's worth," or to coin a new neutral term, free of all distracting emotional resonances, such as "moworth." As, however, the employment of novel terminology sometimes creates new difficulties, we shall try verbally to isolate our problem in the case at bar by referring to "what-you-could-have-got-for-it-in-money-if-you-had-sold-it."

██ What, then, could the taxpayers have got for the scrip in money? In answering that question, we must exclude potential realizations through shady prac-

---

[4] G. C. M. 14,182 (XIV—1 C. B. 152, 153-154, 1935).

[5] Cf. International Freighting Corp., Inc., v. Commissioner, 2 Cir., 135 F.2d 310.

[6] Cf. United States v. Forness, 2 Cir., 125 F.2d 928, 932 and note 5.

[7] Commissioner v. Marshall, 2 Cir., 125 F.2d 943, 946, 141 A.L.R. 445.

[8] As to the unwise glibness of some modern semanticists, see United Ship-

yards, Inc., v. Hoey, 2 Cir., 131 F.2d 525, 527, note 5.

See Radin, A Short Way with Statutes, 56 Harv.L.Rev. 388, 400-401 (1943) for an excellent recent discussion.

[9] See Langmuir, Science, Common Sense and Decency, Science News Letters, Jan. 2, 1943, 3, 4, for a noted physicist's recognition of that difficulty with respect to "electrons."

tices of their own which the taxpayers might have exploited but to which they did not resort. But we cannot disregard a market which to most sellers seemed honest simply because it was created by the devious devices of other persons. Thousands of honest men, in the now unmourned 1920's, received cash for securities on stock exchanges at prices due to what today at least we would regard as the fraud of others. Such a market, if it could absorb any given securities at the quoted prices, is an adequate test of "what-you-could-have-got-for-it." To revert, for a moment to the more conventional phrase, the "fair market value" of securities often consists of what honest and willing dupes (or, to use Americanese, "suckers") were actually paying for similar securities on a "rigged" market.

■ ■ The fact that the market was "rigged" may, however, be relevant if, in connection with other facts, it serves to show that a taxpayer could not have disposed of his securities on that market. In the case before us, the evidence shows that there was a very limited over-the-counter market which was chiefly the result of dealings by the officers of Associated Gas. As they must have been well aware of the condition of that company, it is obvious that they were not buying that scrip in the belief that it would ever be paid; ᴧplainly, they were doing so for some purpose unrelated to the scrip itself. The total amount of scrip sold in a period of about a year, from October 13, 1936 to September 30, 1937, was about 10% of the total amount outstanding and about three times the amount owned by the taxpayers. Because of the relationship between the taxpayers, it is reasonable to assume that no one of them would have sold any of her scrip except in concert with the others. The evidence shows that had the taxpayers' large aggregate block been offered for sale, it could not have been sold in its entirety except perhaps over a period of two years. The testimony is that the prices during the one-year period were sustained by the very fact that the taxpayers' block did not come on the market. How much could have been sold, and at what prices, even in the

first year is purely speculative. What the total price would have been over the two years must rest on the flimsiest sort of guesswork, for there is no evidence whatsoever as to any prices in the second year. The only testimony as to possible sales of taxpayers' scrip was by O'Brien, the principal dealer in the scrip, who said that, if given a period of two years, "I might have been able to liquidate their entire holdings, but * * * it is impossible for me to answer what the price would have been"; he referred to "the limited market for these securities." Indeed, the evidence makes it impossible to say with any degree of assurance that the "insiders," whose purchases were making the "limited market," would have taken the taxpayers' large volume of scrip at any price; as the scrip was registered, it would at once have been known that the taxpayers were "unloading," and this disclosure might well have led those "insiders" to cease their purchases. In the absence of any evidence that there were such sales during the second year, it cannot be presumed that there were such sales or that, if there were any, the prices were anything near the prices paid in the first year; while, for some purposes a legitimate inference may be made that what men have done they will continue to do, there can be no valid inference that men who have rigged a market for one year will do so in a subsequent year. The artificiality of the only market concerning which there is any evidence is therefore distinctly relevant here.

■ The Tax Court, without spelling out its reasoning, assumed that the taxpayers' scrip could have been sold for $35 which is approximately $5 less than the average price of sales during the first year and $7 above the lowest price in that period. We think that there is no substantial evidence to support a finding of anything of like so high a price. There is, of course, a presumption that the Commissioner's determination of a deficiency is correct.[10] But that presumption is rebuttable; and it is rebutted when, as here, the evidence shows that there is no foundation for the price figure he employed.[11] When the taxpayers' evidence showed that there was no

[10] Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Reinecke v. Spalding, 280 U.S. 227, 232, 233, 50 S.Ct. 96, 74 L.Ed. 385; Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184.

[11] Helvering v. Taylor, 293 U.S. 507, 551, 55 S.Ct. 287, 79 L.Ed. 623; Fairmont Cemetery Ass'n v. Helvering, 65 App.D.C. 38, 79 F.2d 163, 164, 165; Lunsford v. Commissioner, 6 Cir., 62 F.2d 740, 742; cf. Guggenheim v. Helvering, 2

reasonable likelihood that any considerable quantity of their scrip could have been sold for any reasonably computable sum in the last three months of the taxable year and for some nine months later, that the sale of all their scrip would have required at least another year, and that the witness most familiar with the market said that it was "impossible" for him "to answer what the price would have been" over the two years, the Commissioner then had the burden of adducing evidence to sustain his assessment. That burden he did not discharge. Nor did the evidence sustain· the Tax Court's finding. That court was entitled to guess, for "value" in such a case as this, as we have said, is at most a guess. But the guess must have some reasonable basis. Of course, we are not permitted to do the guessing and must often approve a conjecture we would not have made. We can, however, say that a particular conjecture is altogether unwarranted by the evidence. We must remand for a revised determination. It goes without saying that either party may, upon application, present further evidence to the Tax Court.

Reversed and remanded.

L. HAND, Circuit Judge (dissenting).

I feel as acutely as my brothers the extreme hardship of assessing a tax against these taxpayers—particularly against her who must pay a deficiency of over $53,000. Nevertheless, harsh as that is, we cannot intervene unless there was no substantial evidence to support the Tax Court's finding of value. There was an active, though limited, market, for the most part apparently created by subsidiary companies, which, we may assume, were manipulating the price to support their own securities. For how long and at what levels they would have continued to do so, we have not the faintest intimation. All we do know is that for the last three months of 1936 at least $400,000 par value of the certificates were sold at between 54 and 40, and that for the first nine months of 1937, one broker (much the largest trader, it is true) bought over $600,000, of which less than $56,000—about nine percent—

were sold below 35. The total par value of the taxpayers' certificates was about $350,000, about one third of the amount sold in the only year of which we have any record. One could not of course throw such a block on the market all at once and get anything approaching 35 for it; but I submit that we have no warrant whatever for saying that, fed gradually by a skilful broker, the whole amount could not have been sold at an average of 35. Some of it could certainly have been sold in the forties; some of it probably at fifty. What the average would turn out to be probably depended ·as I have said altogether upon the price to which the subsidiary companies thought they could afford to let the price drop without spoiling their own market. The only testimony is that the broker who had sold nearly all of what was sold, thought that he could have "liquidated" the taxpayers' certificates within two years; by that I assume he meant that he could have sold them at prices not inordinately below the quotations.

In such a setting any price within certain limits—say 35 and 20—is as likely to be right as any other; the truth being that no price is better than a guess. The Tax Court has made its guess, and it is the only tribunal vested with authority to do so. We are now saying that there was no substantial evidence to support that guess, in which we are quite right; but we are sending the case back to make another guess, which in the nature of things we must know will have as little to rest upon as the first. That seems to me quite beyond our function; the fact that we should have ourselves fixed a lower price—I should also have done so—does not give us authority to compel the Tax Court to do so. The case lies within that penumbra between light and darkness where the first tribunal should be final. The actual value fixed has more to recommend it than for example that which we sustained in Elverson Corporation v. Helvering, 2 Cir., 122 F.2d 295, 298.

Finally, we seem to me to be altogether losing sight of the rule that it always rests on the taxpayer to show that the assessment was wrong.

Cir., 117 F.2d 469, 474; Reinecke v. Spalding, ˙supra; Wickwire v. Reinecke, supra; Farmer v. Commissioner of Internal Revenue, 10 Cir., 126 F.2d 542, 543.