PEDRO SANCHEZ, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 6581.   Promulgated May 24, 1946.

*Harry L. Gutter, Esq.*, for the petitioner.
*Walt Mandry, Esq.*, for the respondent.

1144

OPINION.

Kern, *Judge*: The first issue which we have to decide is whether certain payments, designated as royalties, received by petitioner in

1940 from Sucro-Blanc, Inc., a New York corporation, constituted income from sources within the United States, as respondent contends, or from sources without the United States, as petitioner contends.

Petitioner is the inventor of what we shall call the Sucro-Blanc process for refining sugar, a patent for which, in 1934, had been issued in Cuba, and applied for in the United States, which involves the use of a hypochlorite called Sucro-Blanc. In 1934 he granted the exclusive world-wide license for its use to the Buffalo Electro-Chemical Co., called Becco, to which we have referred in our findings.

The consideration for this transfer was Becco's promise to pay to petitioner a percentage of its net profit from the sale or use of the process or the product, or a minimum of $25,000 a year. Approximately two years later, Becco transferred all its rights to another New York corporation, called Sucro-Blanc, Inc. Petitioner received one-half of the stock of Sucro-Blanc, Inc., numerically (although Becco received a majority of the voting stock), and agreed to modify his contract by accepting from Sucro-Blanc, Inc., in lieu of the consideration specified in his contract with Becco, $30 for each short ton of Sucro-Blanc sold, and 37½ percent of the proceeds of any sale, assignment, license or other disposition of the patent or patent rights, or a minimum of $12,000 a year. Becco was to receive a like amount from Sucro-Blanc, Inc. The amount of the payments based on sales was later reduced to 10 percent of the sale prices f. o. b. Wyandotte, Michigan, of all the Sucro-Blanc sold, and this was the contract in effect in the tax year.

After the original transfer, patents were secured in the United States and many other countries, including those specifically concerned in the situation before us.

During 1940 petitioner received and reported the income which he received, based on sales for use in the United States and its possessions. During the same year 188.55 tons were sold for use in other countries, as set out in our findings, and petitioner received $8,673.30 based on such sales. It is as to this item that the dispute revolves. Petitioner contends it was income from sources without the United States, and hence not taxable to him.

We do not believe that sales of Sucro-Blanc made in this country by Sucro-Blanc, Inc., even though for use in other countries, give a foreign origin to the payments made to petitioner by Sucro-Blanc, Inc., the amount of which was measured by the sales of the product.

It is the petitioner's contention that the exclusive license granted by him covered not only the product, but the process, which is true; and that the sublicenses granted by Sucro-Blanc, Inc., similarly covered both process and product. From this he argues that, although no charge was allocated to the process, as distinguished from the prod-

uct, either in his contract with the corporation or the corporation's contract with its licensees, nevertheless, all the corporation's income arising from the sale of the product, and all of petitioner's income derived from the corporation and measured by such sales, was received for the use of both process and product, and, to the extent that the process and product were used in foreign countries, was income from without the United States. Since he thus denies that the income arises wholly from the sales, he contends the place of sale is immaterial.

In this argument petitioner minimizes the salient fact that he himself had no relationship whatsoever with any person using the process or product in foreign countries. His contractual relationship out of which his income here in question was derived was with an American corporation, Sucro-Blanc, Inc., which disposed of the use of the process in this country and made the product necessary to the process in this country. By reason of his contract, executed in the United States by himself and an American corporation, he was entitled to and received certain payments made to him in the United States from funds held in the United States by a New York corporation. The fact that the New York corporation received a part of these funds from sales made by the corporation to its customers doing business in foreign countries or from sublicenses which it had the right to make, granted by the corporation to persons who used the process licensed in foreign countries, can not affect the characterization of the income derived by petitioner from the New York corporation.

Even if we were of the opinion that the source of the payments to Sucro-Blanc, Inc., would be determinative of the source of the income derived from Sucro-Blanc, Inc., by petitioner, we would still be of the opinion that petitioner's income here in question would be from sources within the United States.

The evidence is far from satisfactory, but it is sufficient to establish that the corporation chose not to charge anything for the installation and use of the patented process by its licensees, looking to the sales of the product for its remuneration. The corporate income, therefore, was, by design, derived from the sales, not the installation or use of the process, and, consequently, the source of the payments to petitioner here in question, upon the hypothesis that the source of the income of the corporation is controlling, would be the sales of Sucro-Blanc. Therefore, the place where the sales of the product were consummated would determine the source of petitioner's income. See *East Coast Oil Co.*, 31 B. T. A. 558.

Petitioner introduced in evidence an exclusive license and a non-exclusive license, executed by Sucro-Blanc, Inc., presumably as typical examples of the type of licenses which it granted.

In the case of the exclusive license agreement, the licensee was W. R.

Grace & Co., a Connecticut corporation, which held the exclusive license for Bolivia, Peru, and Chile, in South America. Petitioner's witness testified that, as to all sales made to W. R. Grace & Co., shipping papers were delivered to it in the United States, and payment was made and received in this country. The contract itself was entered into in New York. Where one domestic corporation sells and delivers to another domestic corporation a product manufactured in the United States, pursuant to a contract entered into in the United States, for which payment is received in the United States, it can scarcely be argued that the shipment of the product thereafter for use in a foreign country makes the money paid for it income arising from a source outside of the United States.

With respect to the sales under the nonexclusive licenses, all the above facts are true, except that the licensee was a foreign corporation. The contract provided that it was to be governed by the laws of New York State. The product was sold f. o. b. Philadelphia, and the shipping papers were delivered and payments were made in New York. We are equally unable to find a foreign source of the income resulting from these sales.

A majority of the so-called foreign sales made in 1940 appear to have been made under these two contracts. If they are not typical of all the sales made during that year, as petitioner suggests in his brief, and if other sales were made providing for the transfer of title elsewhere than in the United States, we have before us no evidence from which we can determine the number or identity of such sales.

Upon this issue and the record before us we decide in favor of respondent.

The second issue involved is the correctness of respondent's action in including in petitioner's taxable income for 1940 royalties in the amount of $7,642.60 which petitioner received in 1940, the check therefor having been issued by Sucro-Blanc, Inc., on January 3, 1940. The royalties were earned in 1939. Petitioner was on a cash basis of accounting.

Petitioner contends that he constructively received these royalties in 1939. Section 19.42–2 of Regulations 103 provides:

Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. * * *

Ordinarily, a taxpayer who employs the cash basis must actually receive the income before he is taxable on it. To constitute construc-

tive receipt, the income must be credited to the account of the taxpayer without restriction, or so set aside for the taxpayer's use that it is under his unrestricted control.

There is no evidence here that the corporation credited the royalties on its books to petitioner, or that the amount thereof was or could have been computed or finally determined before the close of business on December 31, 1939. The contract provided the royalties should be paid quarterly on all sales for which payment had been received during the previous quarter. The evidence indicates that the first entry on the books of Sucro-Blanc, Inc., reflecting the item in dispute was made on January 3, 1940, and was described as a disbursement of royalties due December 31, 1939. It was further shown that the corporation's books showed a balance of $59,250.81 as of December 31, 1939, that the corporate checks required two signatures, and that petitioner was one of the persons authorized as a cosigner of such checks, as an officer of the corporation.

In the case entitled *In re John A. Brander*, 3 B. T. A. 231, and its companion case, *Chester M. Curry*, 3 B. T. A. 237, the taxpayers controlled the corporation, which is not true of the petitioner here. The amounts due were credited to their accounts on the books of the corporation, which is not true here. The taxpayers' failure to receive the amounts due resulted from their deliberate refusal to take them. Here, where the amount was not determinable until the close of the year, petitioner, having received them on January 4, can hardly be said to have willfully declined to receive them in the earlier year.

We have frequently had occasion to reiterate the rule that the doctrine of constructive receipt will be sparingly applied. *William A. Hines*, 38 B. T. A. 1061; *Samuel Keller Jacobs*, 22 B. T. A. 1166; *William H. C. Plety*, 43 B. T. A. 140; *Hal E. Roach*, 20 B. T. A. 919. In the latter case, we said the doctrine would be invoked "only in unique circumstances and a clear case."

The facts here fall short of presenting such a case. We conclude, therefore, that the respondent did not err in his determination that the amount involved in this issue is taxable to petitioner in 1940.

*Decision will be entered under Rule 50.*