FLORENCE H. GRIFFITH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66316.     Filed March 13, 1961.

*Edward M. Pinter, Esq.*, for the petitioner.
*Warren S. Shine, Esq.*, for the respondent.

FISHER, *Judge:* The respondent determined deficiencies in income taxes against the petitioner for the taxable years 1952 and 1953 in the amounts of $1,667.41 and $1,757.12, respectively. The questions presented are: (1) Whether premiums paid on a life insurance policy by petitioner's former husband were includible in petitioner's gross income as periodic payments under a decree of divorce or written instrument incident thereto for the years 1952 and 1953; (2) if the amounts of the premiums are not includible in petitioner's gross income in full, whether they are includible to the extent of the annual increments in cash surrender value of the insurance policy; and (3) whether petitioner qualified as head of a household for the taxable year 1953.

### FINDINGS OF FACT.

Some of the facts were stipulated and are found accordingly.

Petitioner is an individual now residing at 17691 East Ranier Drive, Santa Ana, California. Her income tax returns for the years 1952 and 1953 were filed with the district director of internal revenue, Upper Manhattan District of New York.

Petitioner and Francis Willard Griffith (hereinafter referred to as petitioner's husband or Griffith) were married on September 21, 1926. There were two children of this marriage, Diane Florence Griffith, born in 1928, and Francis Willard Griffith II, born in 1932.

In December 1945 petitioner and her husband became estranged and thereafter lived apart. From that time they were not on friendly terms and have not, from the date of their separation, communicated directly with each other.

Petitioner and her husband retained separate law firms to represent them in contemplated divorce proceedings and in the negotiation of a property settlement and support agreement. Preliminary negotiations with respect to the divorce and settlement agreement began in January 1946. Francis Griffith was present on at least two occasions when the two groups of attorneys held conferences and conferred frequently with his own attorneys. Petitioner did not attend any conferences between the two groups of attorneys although on two occasions she was in an outer room while conferences between the two groups of attorneys were taking place in an adjoining room, and her attorneys on each occasion left the conference several times to confer with her while the conference was in process. She also conferred frequently with her own attorneys during the months in which negotiations were taking place. During the preliminary negotiations there were discussions between the parties' respective attorneys as to the amount of cash alimony which Griffith was to pay to petitioner.

Sometime in February 1946, petitioner's attorneys requested, as a part of the settlement agreement, that Griffith obtain a $100,000 insurance policy on his life and maintain it for the benefit of petitioner with a right in her to the cash surrender value thereof. Griffith made an alternate proposal of $5,000 a year additional cash alimony for 5 years and $500 a year additional for the following 15 years. This counteroffer was refused and petitioner's attorneys insisted on the life insurance policy which Griffith then agreed to provide.

In March 1946, Griffith applied to the Home Life Insurance Company (hereinafter referred to as the company) for a $100,000 policy on his life because at that time it appeared that such a policy would form part of the agreement and he wanted to know as soon as possible whether he was insurable for such amount. In accordance with the application, Home Life Insurance Company's policy No. 537796, insuring Griffith's life in the face amount of $100,000, was issued on April 30, 1946. Before any final agreement was reached between the parties, Griffith exhibited this policy to petitioner's attorneys who were made aware of its terms and premiums. Griffith advised petitioner's attorneys that this was the policy he proposed to use pursuant to the proposed settlement agreement. Petitioner's attorneys made no objection thereto.

The property settlement and support agreement was thereafter executed by the parties on July 12, 1946. Paragraph 1 thereof provides for annual cash alimony payments that Griffith was obligated to make to petitioner during his lifetime or until the remarriage or death of petitioner. Griffith has made the payments required to be made to petitioner under paragraph 1 of the agreement during the

years here involved, and petitioner has reported these amounts on her income tax returns.

Paragraph 5 of the agreement provides:

V. In addition, Mr. Griffith agrees to procure and deliver to Mrs. Griffith policies of insurance with a reputable life insurance company or companies in the face amount of $100,000.00 on his life payable to Mrs. Griffith as beneficiary. The policy shall run for a twenty year duration during which time Mr. Griffith shall pay the premiums so as to maintain it in full force and effect without lapse. In the event a default shall occur in the payment of any of the premiums upon such policy or policies and the said insurance shall lapse and Mr. Griffith shall die without such insurance in effect during the time he is required by this agreement to keep it in effect, Mrs. Griffith shall be entitled to receive out of the husband's estate the sum of $100,000.00 free from all inheritance tax.

Upon demand Mrs. Griffith at any time during the twenty year period aforesaid may obtain the cash surrender value of the insurance policy or policies above mentioned and Mr. Griffith hereby agrees to execute any and all instruments necessary to effect this end. Should Mrs. Griffith avail herself of this option, the insurance provision above set forth shall terminate and it will not be necessary for Mr. Griffith to provide the said insurance.

Paragraph 10 of the agreement provides:

X. This agreement shall become effective upon the entry of the final decree in favor of Mr. Griffith in the divorce proceeding pending in the Court of Chancery of New Jersey as aforesaid, and with the approval of said Court this agreement shall be merged or attached or annexed to the decree nisi and the final decree of divorce as aforesaid, and shall be regarded as incident to the said decrees.

On July 17, 1946, the Court of Chancery of the State of New Jersey, a court of record, entered a decree nisi dissolving the marriage of petitioner and Griffith, to which decree was annexed the property settlement and support agreement described in the preceding paragraphs. The decree nisi specifically provided that this agreement should be regarded as incident to the decree nisi and to the final divorce decree when entered. The Court of Chancery entered a final divorce decree on October 18, 1946, making absolute and final the decree nisi and all its provisions.

Griffith, at the time the agreement was negotiated, understood that as of the effective date of the final divorce decree he was required under paragraph 5 of the agreement to immediately transfer to petitioner the right to the cash surrender value of the policy of life insurance and to make her irrevocable beneficiary thereof for a period of 20 years, executing any and all documents necessary to accomplish this purpose. Under date of July 23, 1946, Griffith wrote a letter to the Home Life Insurance Company which read in part as follows:

I have your letter of July 22, and also the 12 life insurance policies which were sent with it. Under the terms of the agreement made with Mrs. Florence H. Griffith, I am to maintain your Policy No. 537796 for her benefit during her life or until her remarriage. This agreement takes effect October 18, 1946, and

she is to have the right to surrender the policy for its cash value at any time during the period under which I am obligated to maintain it in force.

The insurance company explained to Griffith that the transfer of the right to the cash surrender value to petitioner could be accomplished either by means of a policy modification, transferring the ownership of the policy, or by an absolute assignment of the policy. The effect of each method was pointed out to Griffith. The company would have accepted a bare assignment of the cash surrender value and would have recorded it but would not have placed a modification on the policy itself.

The company then prepared for Griffith the following document which was signed by him on October 18, 1946 (the same day the divorce decree was entered), and attached to the insurance policy:

I, the insured, under Policy #537,796 issued by Home Life Insurance Company hereby revoke all or any previous designations of beneficiary and requests as to the mode of payment of proceeds under said policy and hereby request said Company to pay in one sum the proceeds due at my death to Florence H. Griffith, my wife, as beneficiary, if then living, otherwise to the executors or administrators of my estate.

I further request and agree to a modification of said policy whereby the following provisions will be endorsed thereon and will become effective with respect thereto:

### OWNERSHIP PROVISION

Anything in this policy to the contrary notwithstanding, during the insured's lifetime, Florence H. Griffith, his wife, while living, in the place and stead of the insured, or if his said wife is deceased, the insured, shall be the owner of this policy and may, without the consent of any beneficiary not irrevocably designated, exercise any option, enjoy any privilege, and receive any benefit whatsoever contained in this policy, including, but not by way of limitation, the right to change the beneficiary, whether or not such option, privilege or benefit is specifically reserved to the insured by the terms of this policy.

I do not reserve the right to revoke this request.

Premium notices and receipts in the future are to be sent to Florence H. Griffith, as owner, at the following address:

c/o F. W. Griffith, 37 Empire St.
*Newark 5, New Jersey*

The portion of the above document set forth in the first full paragraph following the heading "Ownership Provision" was endorsed on the policy on October 28, 1946.

The decree of divorce was not amended to permit any substitutions. Petitioner was not apprised of, and did not consent to, the foregoing endorsements as complying with the divorce agreement during any of the time here involved.

It was the practice of the Home Life Insurance Company to refuse to endorse on a life insurance policy the transfer of the right to the cash surrender value thereof unless the owner of the policy made an absolute assignment or transfer of the ownership of such policy. Had Griffith executed a paper assigning to petitioner all his right, title,

and interest in the cash surrender value of the policy instead of executing the endorsement transferring the ownership of the policy to her, the assignment would have been recorded and honored by the insurance company but no modification would have been made on the policy.

Prior to the modification of the policy to change the ownership thereof to petitioner, Griffith had filed a request that the dividends on the policy be used to reduce premiums thereon and in the years here involved the dividends were so used.

The policy provided that in the event premiums were not paid, the cash surrender value of the policy would be applied to keep the policy in full force and effect until the amount of such cash surrender value was exhausted, a provision commonly referred to as automatic extension coverage. Had a premium not been paid, the automatic extension coverage provision would have applied in the absence of other action by the policy owner. Under the terms of the policy, at the end of the 12th year in which it was in force with premiums fully paid, the cash surrender value would have been sufficient to extend the policy for 8 additional years.

The policy here involved was in the possession of petitioner during the years 1952 and 1953, and petitioner knew she was entitled to receive the cash surrender value upon her demand therefor. During the years 1952 and 1953, premiums on the policy were paid to the insurance company by Griffith in the amounts of $3,297 and $3,294, respectively, which were the amounts of premiums due for these years after the reduction of the gross premiums by the dividends of the policy. The increase in the cash surrender value of the policy from January 1, 1952, to December 31, 1952, was $2,325, and the increase in the cash surrender value from January 1, 1953, through December 31, 1953, was $2,375.

At the beginning of the 20-year period, Griffith was 44 and his wife a few years older. Both were in good health.

Petitioner was not married during any part of the year 1953. During this year petitioner maintained as her home a household occupied by her, her married daughter, and 2-year-old granddaughter. The home consisted of a 4-bedroom, 2-bath apartment in Long Island, New York, the lease on which was in her daughter's name. Petitioner's daughter was unemployed during the year 1953. Petitioner's son-in-law was an enlisted man in the United States Navy during the year 1953 and resided in the apartment when he was not away performing his duties in the Navy. He was away from home several weeks at a time periodically throughout the year. Petitioner gave $150 a month to her daughter to be used to pay the monthly rental of the apartment and gave her daughter $100 a month to be used for the purchase of food. The utility bills and telephone bills were paid by

petitioner's daughter. Petitioner's son-in-law during 1953 had a monthly allotment sent to his wife (petitioner's daughter) by the Navy. Petitioner furnished over half of the cost of maintaining the household.

OPINION.

*Issue 1.*

In order for the insurance premiums paid by Griffith during the years here involved, or any portion thereof, to be included in petitioner's taxable income, such amounts must constitute periodic payments received by her in discharge of a legal obligation imposed upon or incurred by Griffith under a divorce decree or written instrument incident thereto.[1]

Petitioner concedes that the premium payments here involved were periodic payments made pursuant to the agreement incident to the divorce. This leaves us with the question of whether these payments, or any part thereof, were *received* by petitioner during the years here involved.

The actual payments of the insurance premiums were made by Griffith to the insurance company and not to petitioner. Petitioner took no steps to obtain the cash surrender value of the policy. Petitioner did not receive, either actually or constructively, any money or property in the taxable years in question in relation to the policy or the premiums thereon. (See discussion *infra* relating to increment in value of cash surrender value.)

The divorce agreement provided that the policy was to be maintained by Griffith for a 20-year period, that petitioner would be the sole beneficiary, and that Griffith would execute papers allowing her to obtain the cash surrender value upon her demand. There was no requirement that ownership of the policy be transferred to petitioner.

Subsequent to the decree and agreement incorporated therein, and after consulting the legal department of the insurance company, Griffith (by the document of October 18, 1946) designated petitioner the beneficiary of the policy and transferred to her the ownership of the policy for her life. The document further provided that should petitioner predecease her husband, his estate would become the beneficiary of the policy and the ownership (including the right to the cash surrender value) would revert to him.

---

[1] Sec. 22(k), I.R.C. 1939, provides:

(k) ALIMONY, ETC., INCOME.—In the case of a wife who is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, periodic payments (whether or not made at regular intervals) received subsequent to such decree in discharge of, or attributable to property transferred (in trust or otherwise) in discharge of, a legal obligation which, because of the marital or family relationship, is imposed upon or incurred by such husband under such decree or under a written instrument incident to such divorce or separation shall be includible in the gross income of such wife, and such amounts received as are attributable to property so transferred shall not be includible in the gross income of such husband. * * *

We are here confronted with a situation where a husband transferred rights which were not required to be transferred by the divorce decree or the agreement incorporated therein. In determining the taxability of what was received by petitioner, however, we are limited to the requirements of the agreement adopted as part of the decree, and, of course, by the further limitation of what was in fact received by her if such was less than the requirements of the instrument and decree. See *Peter Van Vlaanderen*, 10 T.C. 706 (1948), affd. 175 F. 2d 389 (C.A. 3, 1949).

Respondent concedes that the agreement did not expressly require the transfer of complete ownership to petitioner. He contends, however, that under the practices of the insurance company it was necessary to transfer complete ownership to comply with the obligation to transfer the right to the cash surrender value. He concludes, therefore, that the wife was given ownership of the policy pursuant to the divorce agreement and, as a corollary, that the premiums paid by her husband are income to her.

This conclusion and the cases cited by respondent are inapplicable as respondent's major premise is not sustained by the evidence. We are convinced from the testimony of the insurance company official that his company would have recorded and honored an assignment by Griffith of only the cash surrender value if Griffith had insisted upon it even though the assignment would not have been endorsed on the policy itself. In any event, we think that the question of whether or not the insurance company's attitude was a factor in persuading Griffith to assign ownership is not here significant.

The parties argue extensively in their respective briefs concerning the time Griffith was to execute the papers granting petitioner the right to the cash surrender value. This question, also, is immaterial here. Whether Griffith was to execute the proper papers immediately, or only after a demand was made by petitioner, it is clear that Griffith was not obligated either under the terms of the divorce agreement or by the practices of the insurance company to transfer complete ownership of the policy to petitioner. Any transfer of rights in the policy beyond those required by the decree and agreement incident thereto was gratuitous and voluntary and cannot affect the taxability of the premiums in issue.

Stripped of this contention, we then have the case of a wife who, under the agreement and decree, is not the complete owner of a policy but is merely a contingent beneficiary with the right (under specified conditions) to the cash surrender value. The question of whether premiums paid by the husband, in situations similar to this, are taxable to the wife has been before the courts on numerous occasions. The cases uniformly hold that when the wife under the divorce agreement is not the complete owner of the policy and her

interest in the policy is simply that of a contingent beneficiary, the premiums paid by the husband are not income to the wife or deductible by him. See *James Parks Bradley*, 30 T.C. 701 (1958), appeal dismissed pursuant to stipulation (C.A. 9, 1959); *Beulah Weil*, 22 T.C. 612 (1954), affirmed on this issue 240 F. 2d 584 (C.A. 2, 1957); *Carl Ortmayer*, 28 T.C. 64 (1957), modified without discussing this issue 265 F. 2d 848 (C.A. 7, 1959); *Lillian Bond Smith*, 21 T.C. 353 (1953), appeal dismissed (C.A. 9, 1954); *Raoul Walsh*, 21 T.C. 1063 (1954). This conclusion has also been stated in respondent's own rulings. See I.T. 4001, 1950–1 C.B. 27; Rev. Rul. 57–125, 1957–1 C.B. 27.

In many of the cases and rulings cited above, the wife's interest as beneficiary was conditioned only upon her surviving her husband. In the instant case there was the double contingency that petitioner survive her husband, and this event occur within the 20-year period. At the beginning of this period, Griffith was 44 years old and petitioner was a few years older. Both were in good health. The possibility of her ever receiving the full proceeds was, therefore, more remote than that applicable to some of the wives in the cases cited.

Whatever rights in the entire policy petitioner acquired were defeasible since they depended upon contingencies. It is not certain that the payment of the insurance premiums will ever benefit petitioner, since her interest ceases upon her death or upon the expiration of the 20-year period. Griffith retained a substantial interest in the policy and the policy was not for petitioner's sole benefit.

The situation in the instant case, however, differs from those in the cases and rulings cited, *supra*, in that here the wife had the right to the cash surrender value. Respondent, in an alternative argument maintains that this right, coupled with the rights as beneficiary, though both are contingent, are sufficient to cause all of the premiums to be taxable to petitioner. In the authorities cited above, complete ownership in the wife was stated as a prerequisite for taxing her on the premiums paid by the husband. Respondent, then, would have us believe that the heavily restricted right to the cash surrender value which petitioner received under the agreement is equal to complete ownership in the policy. This contention is untenable. The complete rights of ownership, even when they are to last only during the lifetime of the holder, include the rights to borrow, to assign the policy, to change the beneficiary, to dividends, to exercise any of the options on the policy, and to the policy after the 20-year period. Inasmuch as these rights far exceed the rights which were given to petitioner under the divorce agreement, it cannot be held that petitioner received the full benefits of ownership of the policy, and hence, the full benefits of the premiums paid. For these reasons and upon the authorities stated *supra*, we are of the opinion that the entire amount

of the premiums were not paid for petitioner's sole benefit and that they are not includible in her taxable income for the years involved under section 22 (k) of the 1939 Code.

The payment of premiums in each of the years before us increased the cash surrender value of the policy by an ascertainable amount, and petitioner could obtain the cash value upon demand. Respondent, in the alternative, argues that at least this annual increment should be taxable income to petitioner during the years in issue. The question remains, then, whether the annual increment in the cash surrender value during each of the years in issue was constructively received by petitioner.

To constitute [constructive] receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment *or condition upon which payment is to be made,* * * * [Regs. 111, sec. 29.42–2. Emphasis added.]

The regulations and authorities require that there be no legal provision of real consequence upon which taxpayer could rely in refusing immediate payment before income will be deemed constructively received. See *Walter I. Bones*, 4 T.C. 415, 420 (1944).

We think that cannot be said here. Petitioner had a very good legal reason to refuse to exercise her right to the cash surrender value. While she could have demanded it at any time, by so doing, she would forfeit any further rights under the policy and the husband would be relieved of the obligation to furnish insurance. Under the circumstances, absent such demand, we think no taxable event occurred.

The doctrine of constructive receipt is based upon the sound assumption that income which is unqualifiedly subject to one's control will eventually be physically received by him. The taxpayer, therefore, should be taxed at the time he could receive it rather than be able to postpone the payment of tax by voluntarily postponing taking possession. While it is not necessary to prove beyond doubt that the taxpayer will eventually receive the income, the possibility that she may never receive it should be weighed in deciding whether the doctrine is applicable.

In this connection, it should be noted that because of the automatic extension coverage in the policy, there is the possibility that the cash surrender value may be completely or partially depleted upon Griffith's failure to pay premiums. Inasmuch as the agreement only requires Griffith to "pay premiums so as to maintain it in full force and effect without lapse," it is possible that the cash surrender value may be depleted for the payment of premiums. In such event petitioner may never receive any of the cash surrender value which respondent wishes to tax to her even if she later demanded it.

The situation here is similar to those in which there is an increment by way of interest, dividend, or increase in value of property owned by the taxpayer where there exists a substantial restriction upon exercising the right to take such increment in cash. See *Estate of W. T. Hales*, 40 B.T.A. 1245 (1939). In that case subscribers to building and loan shares were required to make a downpayment of $50 per share, and each share was to mature when the downpayment, *plus dividends declared and credited*, equaled the sum of $100. The shareholders were entitled to surrender their shares before maturity and receive the amounts paid in on the shares and the accumulated dividends. Holders of the shares were not entitled to receive the accumulated dividends thereon without, at the same time, surrendering their certificates and withdrawing from the association the entire investment represented by the shares. In holding that the dividends were not taxable to the shareholder in the year credited, we said (p. 1248) :

It has frequently been said that the constructive receipt is to be sparingly applied and is not applicable unless the cash or its equivalent is unqualifiedly subject to the demand of the taxpayer. The petitioners * * * could have surrendered the shares of Local Building for cash. The respondent argues that during this period the cash was constructively received. However, the petitioners could have received the cash only by the surrender of the shares of Local Building, * * *. This was a valuable right and forms a sufficient restriction to make inapplicable the doctrine of constructive receipt. * * *

In a situation such as that above, the dividends are irrevocably credited to the taxpayer and it is certain that he will come into possession of them at a future date. In the instant case this certainty of future payments is not present, so that here there is a stronger reason for holding that they were not constructively received. In both situations the crucial test is whether the money or property is unconditionally subject to the taxpayer's demand. Inasmuch as petitioner could have demanded the cash surrender value only if she gave up all interest in the insurance and released her husband from the obligation to furnish it, the annual increment cannot be deemed to have been constructively received by her during the years in question since such demand and receipt would be subject to significant conditions.

We have frequently had occasion to reiterate the rule that the doctrine of constructive receipt will be sparingly applied. See *Pedro Sanchez*, 6 T.C. 1141, 1148 (1946), affd. 162 F. 2d 58 (C.A. 2, 1947); *Hal E. Roach*, 20 B.T.A. 919, 925 (1930). In the latter case we said the doctrine would be invoked "only in unique circumstances and a clear case."

The facts here fall short of presenting such a case, where no taxable transaction took place. To tax the possibility of a benefit in the

instant case would be to extend the doctrine of constructive receipt to unwarranted limits.

## Issue 2.

Petitioner was not married during the taxable year 1953. She paid $250 per month during this year on the cost of maintaining as her home a household which was the principal place of abode of herself, her daughter, her unmarried granddaughter, and of her son-in-law when he was not away in the Navy. In order to be entitled to compute her tax as head of a household, petitioner must show that she maintained the household as her home, that it was the principal place of abode of a dependent or unmarried descendant, and that she paid over one-half of the cost of maintaining the household.[2] It is clear that the apartment for which petitioner paid the rent was her home during the taxable year even though the lease was in her daughter's name. It is equally clear that this apartment was the principal place of abode of petitioner's unmarried granddaughter. The remaining requirement that must be met is that petitioner establish that she paid more than one-half the cost of maintaining the household. The respondent's regulations provide that the cost of maintaining the household are the expenses incurred for the benefit of all the occupants such as rent, utilities, upkeep, and food consumed on the premises.[3]

Petitioner contributed $250 monthly toward the maintenance of the household; i.e., $150 for rent, and $100 for food. The problem as it comes before us is whether or not petitioner has met the burden of proving that she contributed more than half of the cost of maintain-

---

[2] Sec. 12(c)(3), I.R.C. 1939, provides:

(3) DEFINITION OF HEAD OF HOUSEHOLD.—For purposes of this chapter, an individual shall be considered a head of a household if, and only if, such individual is not married at the close of his taxable year and maintains as his home a household which constitutes for such taxable year the principal place of abode, as a member of such household, of:

(A) A son, stepson, daughter, or stepdaughter of the taxpayer, or a descendant of a son or daughter of the taxpayer, but if such son, stepson, daughter, stepdaughter, or descendant is married at the close of the taxpayer's taxable year, only if the taxpayer is entitled to an exemption for the taxable year for such person under section 25(b) ; or

(B) Any other person who is a dependent of the taxpayer, if the taxpayer is entitled to an exemption for the taxable year for such person under section 25(b).

An individual shall be considered as maintaining a household only if over half of the cost of maintaining the household during the taxable year is furnished by such individual.

[3] Regs. 118, sec. 39.12–4(d), provide:

(d) *Cost of maintaining a household.* The taxpayer shall be considered as maintaining a household only if he pays more than one-half the cost thereof for his taxable year. The cost of maintaining a household shall be the expenses incurred for the mutual benefit of the occupants thereof by reason of its operation as the principal place of abode of such occupants for such taxable year. Such expenses include property taxes, mortgage interest, rent, utility charges, upkeep and repairs, property insurance, and food consumed on the premises. The cost of *maintaining a household shall not include expenses* otherwise incurred. Thus, such cost does not include expenses incurred for clothing, education, medical treatment, vacations, life insurance, and transportation. In addition, the cost of maintaining a household shall not include any amount which represents the value of services rendered in the household by the taxpayer or by a person specified in section 12(c)(3)(A) or provided for in section 12(c)(3)(B).

ing the household. While the evidence is meager and circumstantial, after careful consideration we are satisfied that there is no practical likelihood that amounts contributed by others to the cost of maintaining the household could have equaled or exceeded petitioner's contributions. We hold, therefore, that petitioner is entitled to compute her income tax for the year 1953 as the head of a household.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

RAUM, *J.*, dissenting: I cannot agree with the result reached in the prevailing opinion on the first issue. As part of the agreement the husband undertook to obtain a $100,000 policy on his own life, with his wife as beneficiary, which policy was to "run for a twenty year duration during which time Mr. Griffith shall pay the premiums so as to maintain it in full force and effect without lapse," and the wife was to have the right "at any time during the twenty year period * * * [to] obtain the cash surrender of the insurance policy." Although the agreement may have entitled the husband to some residual rights in the policy—and this is by no means clear from a reading of the agreement—it is plain that the wife who was the primary beneficiary and who had the right to surrender the policy for cash had the dominant interest in the policy, and any possible residual rights of the husband were subject to defeat at will by the wife through the exercise of her plenary power.

In these circumstances premiums paid by the husband to procure such valuable rights for the wife must certainly be regarded as having been paid in her behalf. As the prevailing opinion recognizes, there is no dispute that payments were "periodic" within the meaning of section 22(k), but the decision appears to rest upon the conclusion that such payments were not "received" by the wife. There is discussion in the opinion as to whether the wife would ever obtain the proceeds of the policy and there is also some discussion dealing with constructive receipt. I think this is all beside the point.

The applicability of section 22(k) in this case should not turn upon the troublesome doctrine of constructive receipt, and it should be a matter of no consequence whether the wife would ever obtain the proceeds of the policy. The important consideration is that she bargained for and obtained the obligation of her husband to pay annual premiums for a period of years on a life insurance policy in which she was to be the primary beneficiary and with respect to which she was to have the power to surrender for cash. The premiums paid by the husband thus procured valuable rights for the wife which should be taxable to her just as though he had paid her grocery bill or fire insurance premium. The fact that her furniture might never burn

and that she would thus never obtain the proceeds of the fire insurance policy would in no way prevent the payment of such premiums on her behalf from being treated as having been "received" by her, for what she would have "received" in such circumstances would have been the valuable rights represented by the fire insurance policy. The petitioner herein similarly "received" the valuable rights reflected in the life insurance policy before the Court, and the value of those rights can readily be equated to the cost of procuring them, namely, the premiums. Cf. *Guggenheim* v. *Rasquin*, 312 U.S. 254; *Powers* v. *Commissioner*, 312 U.S. 259. Moreover, the amounts thus expended for the policy may not be scaled down by reason of any possible residual rights of the husband, because they were subject to the plenary control of the wife. I think that the premiums paid were properly attributable to the wife as income under section 22(k), and should correspondingly be allowable as a deduction to the husband under section 23(u).

TRAIN, *J.*, agrees with this dissent.

---

SCOTT, *J.*, dissenting: The majority opinion recognizes that the payments made on the life insurance policy here involved were periodic payments made pursuant to the agreement incident to the divorce. This leaves as the crucial question whether these amounts or any parts thereof were received by petitioner. The actual payments of the insurance premiums were made by petitioner's husband to the insurance company and not to petitioner. Therefore, the amounts of the insurance premiums or any parts thereof were received by petitioner only to the extent that by their payment petitioner in the taxable years in question received, either actually or constructively, cash or property of ascertainable value. *Seligmann* v. *Commissioner*, 207 F. 2d 489 (C.A. 7, 1953), which was followed in *Leon Mandel*, 23 T.C. 81 (1954).

In the *Seligmann* case, the court specifically pointed out that the taxpayer had no rights in the policy and that even though the payment in each year increased the cash surrender value of the policy, there was no possibility under the agreement there involved that the increase in value could accrue to her.

The situation in the instant case differs from that in the *Seligmann* case in that in the instant case when the payment of the premium in each year increased the cash surrender value of the policy by an ascertainable amount, this increased cash surrender value belonged absolutely to petitioner even though her right to the amount thereof might be lost if unexercised before the end of the 20-year period. This increment in cash surrender value in each year was property received by petitioner. Receipt of an amount is not necessarily in cash but may be in property having an ascertainable value. Cf. *Charlotte*

*L. Andrews,* 46 B.T.A. 607 (1942), affirmed on this issue, reversed on another issue 135 F. 2d 314 (C.A. 2, 1943).

Under the agreement incident to the divorce, petitioner's husband would have been relieved from maintaining the policy had petitioner exercised her right to take the cash surrender value thereof in either of the years here involved. Petitioner, in order to reduce to cash her property of ascertainable value, would have been required to relinquish her contingent right to receive a larger amount. However great a deterrent this may have been to petitioner's exercising her right, it does not change the fact that the full amount of the cash surrender value of the policy was at all times here involved her property.

The facts here are distinguishable from a situation in which there is an increment by way of interest, dividend, or increase in value of property owned by a taxpayer where there exists a substantial restriction to that taxpayer's exercising the right to take in cash such increment. Cf. *Estate of W. T. Hales,* 40 B.T.A. 1245 (1939). Nor is the situation here comparable to an annuity purchased by a taxpayer for himself, the cash surrender value of which is increased in each year by his own premium payment. Cf. *Estate of Harry Snider,* 31 T.C. 1064, 1070 (1959). Such cases are concerned with the constructive receipt of income from property owned by a taxpayer. Here it was not income from the property owned by petitioner but the payment by her husband in each year which increased the value of her property. This increase in value of her property was actually received by petitioner in each year here involved from periodic payments made by her husband pursuant to an agreement incident to a divorce. The value of the property she received from her husband in each year, the amount of the increment in the cash surrender value of the insurance policy during that year, should be taxable to her under section 22(k) of the Internal Revenue Code of 1939.

WITHEY, *J.,* agrees with this dissent.