517 F.2d 75
 75-1 USTC P 9480
 AMERADA HESS CORPORATION, Successor by merger to Hess Oil &
Chemical Corporation (J. D. Callendar Financial
Vice-Pres.), Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE.
AMERADA HESS CORPORATION, Successor by Merger to Hess Oil &
Chemical Corporation (Harold N. Bast, Vice-Pres.), Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE.
WHITE FARM EQUIPMENT COMPANY, a Delaware Corporation
(Successor to Oliver Corporation, a Delaware Corp.)
v.
COMMISSIONER OF INTERNAL REVENUE, Appellant.
 Nos. 74-1633 to 74-1635.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 27, 1975.
Decided May 13, 1975.
 
 Norman Sinrich, S. L. Warhaftig, Paul R. Hessel, David Klingsberg, Esq., of Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellant Amerada Hess Corp.
 Meyer Rothwacks, Scott P. Crampton, Ernest J. Brown, Meade Whitaker, Gilbert E. Andrews, Bennet N. Hollander, and Michael J. Roach, Esq., Tax Div., U. S. Dept. of Justice, Washington, D. C., for Commissioner of Internal Revenue, appellee in Nos. 74-1633/4 and appellant in No. 74-1635.
 Andre M. Saltoun, Dennis I. Meyer, Francis D. Morrissey, and Neal J. Block, Baker & McKenzie, Chicago, Ill., for appellee White Farm Equipment Co.
 Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 On this appeal, Amerada Hess Corporation[1] challenges the Tax Court's determination of a deficiency in Hess' income tax payments for 1964 and 1965;[2] the Commissioner appeals the same court's decision[3] that White Farm Equipment Company[4] had overpaid taxes in the years 1960, 1961 and 1962.[5]
 
 
 2
 The case has its genesis in a routinely complex corporate acquisition. In March 1960, Oliver Corporation,[6] Hess' predecessor,[7] and White Motor Company,[8] which owns White Farm,[9] entered into negotiations aimed at the sale of Oliver's farm equipment business[10] to White. The negotiations with White constituted Oliver's third attempt in two years to dispose of its farm equipment business.[11] Oliver originally sought a cash deal, but when it became apparent that White would not be able to raise enough cash, it was agreed that the bulk of the acquisition price would be paid in White common stock.[12] In order to establish the number of shares which Oliver would receive, the parties had to assign the stock a value. An initial figure of $50.00 per share was adjusted to $48.50 per share. This latter figure represented the closing price of White common quoted by the New York Stock Exchange on June 23, 1960, the date on which the adjustment in assigned value was proposed.
 
 
 3
 After several months' negotiations,[13] an agreement setting out the terms for White's acquisition of the Oliver assets was executed on October 3, 1960, subject to approval by shareholders of both corporations.[14] White was to acquire substantially all the working assets of Oliver's farm equipment business[15] in exchange for 655,000 shares of White common stock, plus an amount of cash to be determined as of the closing date. The agreement contained a formula, based on the book value of Oliver's assets, for ascertaining the total dollar price which White was to pay Oliver.[16] The 655,000 shares of stock, at the assigned value of $48.50 per share, represented $31,767,500.00 of the purchase price. If the value of Oliver's assets on the closing date, October 31, 1960, exceeded $31,767,500.00, White would pay Oliver the difference in cash. Conversely, if the value of the assets was less than $31,767,500.00, Oliver would pay White the difference in cash. N.T. 84; White Motor Company Proxy Statement, Exhibit 19-O, at p. 3, P (c). Despite the slide in the stock's quoted price between June 23 and October 3, the parties made no attempt to renegotiate the $48.50 per share figure. The assigned value continued to fix the portion of the purchase price Oliver would receive in stock and, thereby, to determine the amount of cash that would change hands. However, neither the written agreement nor any negotiations predating that agreement indicated that the assigned value had any tax or accounting significance.[17]
 
 
 4
 Besides terms relating to the purchase price, the agreement included a Trust Agreement. The White shares were to be held in trust until they were either distributed pro rata to Oliver shareholders, in exchange for Oliver common stock, or sold.[18] Should the shares be sold, no more than 10,000 shares could be acquired by any one purchaser.[19]
 
 
 5
 At special shareholders' meetings held on October 31, 1960, the shareholders of both White and Oliver approved the agreement. On that date, Oliver transferred its assets to White; in return, White delivered the 655,000 shares to the trustee, paid Oliver $1,508,550.00 in cash, and assumed $281,396.00 of Oliver's liabilities.[20] White common traded on the New York Stock Exchange at an average price of $36.3125 on October 31. White initially recorded the Oliver assets on its books in an amount which reflected a per share valuation of $36.3125. However, before closing its books for 1960, White was advised by its accountants[21] to carry the assets at a figure reflecting the assigned valuation of $48.50 per share. White accordingly adjusted the entries to correspond with the higher, assigned value. Oliver[22] entered the White common on its books at an aggregate value of $23,784,688.00, which represented a per share price of $36.3125. No alterations were made in this entry.
 
 
 6
 26 U.S.C. § 1001(b) provides, inter alia, that the "amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of property (other than money) received." The amount realized by both parties to the acquisition was thus determined by the fair market value of the White common stock. Since the amount realized in turn determined the taxes which each party owed on the transaction, the fair market value was the factor controlling the parties' tax liability. White's[23] federal income tax returns for 1960, 1961, and 1962 reported income from the Oliver acquisition on the basis of the $48.50 per share valuation. Oliver employed the October 31 average market price of $36.3125 per share in reporting a loss from the sale of its farm equipment business on its 1960 federal income tax return. Subsequently, the Commissioner determined that both parties had underpaid their taxes on income attributable to the transaction. The fact and amount of underpayment by each party hinged on the fair market value of the White shares. See 26 U.S.C. § 1001(b). Assessing a deficiency against both White Farm,[24] White's successor, and Hess, Oliver's successor,[25] required the Commissioner to take inconsistent positions concerning the correct valuation of the shares. Thus the Commissioner maintained in one case that White Farm had erred in pricing the White common at $48.50 per share, while arguing in the second case that Hess had erred in failing to assign the stock the same value. Since prosecuting both cases separately[26] might well have resulted in contradictory valuations of the shares, the cases were consolidated for trial in the Tax Court.[27] The Commissioner's position was essentially that of a stakeholder whose "primary concern" was that the shares be valued consistently as to each party. 61 T.C. at 206. However, in his briefs in the Tax Court and this court, as well as at oral argument before this court, the Commissioner adopted Hess' position, urging that "the best evidence of the fair market value of the White stock is its mean trading price on the New York Stock Exchange on the closing date, October 31, 1960." 61 T.C. at 214. The Tax Court rejected this argument in holding that the value of the shares was that assigned by the parties in their October 3 agreement, i. e., $48.50 per share. Both the Commissioner and Hess appeal from that holding. We reverse.
 
 
 7
 The primary question on appeal concerns the proper method for measuring the fair market value of shares traded on a stock exchange. Both appellants contend that the average exchange quotation on the valuation date in this case, $36.3125 per share is the best evidence of fair market value. Hess further argues, as a secondary issue, that the market price on October 31, 1960, should be discounted to compensate for a blockage factor. We consider these assertions seriatim.
 
 I. FAIR MARKET VALUE
 A. Standard of Review
 
 8
 As a threshold matter, we must determine the scope of review open to us on this appeal. White Farm, claiming that the Tax Court's determination of fair market value is "purely one of fact," Brief of Petitioner-Appellee at 14, would have us limit our inquiry to whether that determination is "clearly erroneous." The computation of the actual dollar worth of the stock is concededly a question of fact. The question for decision, however, is whether the Tax Court "failed to use correct standards of valuation applicable to the (factual) situation which it found." Richardson v. Commissioner, 151 F.2d 102, 103 (2d Cir. 1945). In choosing one method of valuation, the Tax Court set a legal standard, which is to be reviewed as such. See Churma v. United States Steel, 514 F.2d 589 (3d Cir. 1975); Katz v. Carte Blanche, 496 F.2d 747, 756-57 (3d Cir. 1974). As this court observed in Publicker v. Commissioner of Internal Revenue, 206 F.2d 250, 252 (3d Cir. 1953), cert. denied, 346 U.S. 924, 74 S.Ct. 312, 98 L.Ed. 418 (1954),
 
 
 9
 "The criteria to be employed in determining 'value' necessarily must differ somewhat in respect to the kinds of property to be valued under the statute. A question of law is presented therefore as to the standard to be applied. See Powers v. C. I. R., 1941, 312 U.S. 259, 260, 61 S.Ct. 509, 85 L.Ed. 817. But the Tax Court's determination of value, the proper standard having been applied by it, is a finding of fact. This finding, based upon the resolution of conflicting evidence, may not be disturbed unless clearly erroneous."[28]B. The General Rule and Its Exceptions
 
 
 10
 There is no real dispute as to the definition of "fair market value." N.T. 448; 493-94, 501. According to the classic formulation, "(f)air market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973), quoting Treas.Reg. § 20.2031-1(b). S. Alfred, Fair Market Value Concept: General Considerations, 14 W.Res.L.Rev. 173, 175 (1963). The dispute in this case is over the application of the definition and, more specifically, over the proper method by which that ideal price can be measured under less than ideal conditions. Since "the word 'value' almost always 'involves a conjecture, a guess, a prediction, a prophecy,' " Andrews v. Commissioner, 135 F.2d 314, 317 (2d Cir.), cert. denied, 320 U.S. 748, 64 S.Ct. 51, 88 L.Ed. 444 (1943), quoting, Commissioner v. Marshall, 125 F.2d 943, 946 (2d Cir. 1942), there is no universally infallible index of fair market value. All valuation is necessarily an approximation. Where, however, the property to be valued consists of securities traded on a stock exchange, the general rule is that the average exchange price quoted on the valuation date[29] furnishes the most accurate, as well as the most readily ascertainable, measure of fair market value. United States v. Cartwright, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); Hazeltine Corp. v. Commissioner, 89 F.2d 513, 519 (3d Cir. 1937); Richardson v. Commissioner, 151 F.2d 102, 103 (2d Cir. 1945), cert. denied, 326 U.S. 796, 66 S.Ct. 490, 90 L.Ed. 485 (1946); Andrews v. Commissioner, 135 F.2d 314, 318 (2d Cir.), cert. denied, 320 U.S. 748, 64 S.Ct. 51, 88 L.Ed. 444 (1943); Rogers v. Helvering, 107 F.2d 394, 396 (2d Cir. 1939); W. T. Grant Co. v. Duggan, 94 F.2d 859, 861 (2d Cir. 1938); Southern Natural Gas Co. v. United States, 412 F.2d 1222, 1252, 188 Ct.Cl. 302 (1969); Porter, The Cost Basis of Property Acquired by Issuing Stock, 27 Tax Lawyer 279, 281 (1973-74); Alfred, supra at 175-76; Bonbright, Valuation of Property, Vol. II, 1023 (1937); cf. Bankers Trust Co. v. United States, 459 F.2d 484, 198 Ct.Cl. 306 (1972). In Hazeltine, supra at 519, this court said:
 
 
 11
 "The Board seems to have ignored the evidence of fair market value furnished by the sales upon the Curb Exchange and in this we think it fell into error. The primary evidence of the fair market value of corporate stock is what willing purchasers pay to willing sellers on the open market, even though the assets of the corporation do not reflect such values. . . . In the present case, however, the evidence indicated a large volume of trading in these shares in a market which was fair and open and not distorted by any abnormal conditions or factors. . . . In the light of these facts we are of opinion that the fair market value of the shares on February 19th was conclusively established by the evidence of the sales which took place on the Curb Exchange on that day."
 
 
 12
 There are, of course, exceptions to this general rule. The assumption underlying the concept of the market as an index for valuing particular property is that the property to be valued is substantially similar to the property actually sold on the market. Heiner v. Crosby, 24 F.2d 191, 193 (3d Cir. 1928). Where the market exhibits such peculiarities as cast doubt upon the validity of that assumption, the market price must be either adjusted or discarded in favor of some other measuring device, such as the "intrinsic value" or "barter-equation" method.[30] Thus, where the marketreflects only "sales of small lots, forced sales, and sales in a restricted market, (it) may not furnish evidence of fair market value." Hazeltine, supra at 519; Heiner v. Crosby, supra. Similarly, where the stock price on the valuation date is so markedly "out of line with its price on the said Exchange throughout the year straddling the critical date" as to be aberrational, another index may be preferable. Richardson v. Commissioner, supra at 103.[31]
 
 
 13
 Also, stock which is subject to restrictions on alienation or voting rights is likely to be valued either at a discount from market price, LeVant v. Commissioner, 376 F.2d 434 (7th Cir. 1967), or according to another valuation method. E. G. Rodman, 57 T.C. 113 (1971). Adjustment of the market price is necessary for stock which carries "extras," such as control or additional voting rights,[32] as well as for exceptionally large blocks of stock which lack these "extras."[33] Commissioner v. Stewart's Estate, 153 F.2d 17 (3d Cir. 1946); Richardson, supra. The better view is that the market does provide the best evidence of value, notwithstanding a depressed state, or even a large-scale manipulation, of the market as a whole. Market cycles and susceptibilities are, after all, part of the risk which the trader assumes and which is one of the determinants of value. Andrews v. Commissioner, supra ; W. T. Grant Co. v. Duggan, supra. But see Strong v. Rogers, 72 F.2d 455, 457 (3d Cir.), cert. denied, 293 U.S. 621, 55 S.Ct. 217, 79 L.Ed. 709 (1934).[34]
 
 
 14
 Even in the "exceptional" situation, the market price may provide the best point of departure for valuing securities. Market analysts have developed reliable techniques for determining the amount by which the market price should be adjusted to correct for various abnormalities. Where such techniques are relevant, they can be used to adapt the market price so that it sets the fair market value with considerable accuracy.
 
 
 15
 The Tax Court, however, neither adopted nor adapted the market price as the proper index of valuation in this case. It held, rather, that the valuation assigned by the parties was commensurate with fair market value within the meaning of 26 U.S.C. § 1001(b). That the court thus rejected the market pricing mechanism in favor of the "barter-equation method" of valuation is clear from the fact that the assigned value was an aliquot portion of the agreed purchase price for the Oliver assets. As authority for choosing the barter-equation method, the court relied exclusively upon cases dealing with the valuation of "exceptional" property.[35]C. The Tax Court Holding
 
 
 16
 Most of the cases cited by the Tax Court involved the valuation of property for which no established market existed.[36] In such cases, of course, there is no opportunity to resort to market prices and other means of valuation must be employed. Yet on the basis of these cases, the Tax Court required Hess, as "the taxpayer attacking an assigned value in an agreement to which he was a party," to "prove that the valuation had no basis in fact or business reality and did not represent the actual intention or agreement of the parties." 61 T.C. at 211. Moreover, the same burden was placed on the Commissioner. Id. The court itself acknowledged that "the usual application of the 'strong proof' rule is to an assigned valuation of a covenant not to compete in a sales agreement," but found "the rule equally applicable to the instant transaction where the parties assign a value to shares of stock." Id. The authority cited for this latter proposition is readily distinguishable.[37] It is likewise obvious that only the parties to such a covenant could value it; there exists no outside valuation index. More importantly, however, the proposition itself ignores the reason behind requiring "strong proof" in cases where one party to an agreement which sets the value of a covenant not to compete subsequently seeks to avoid the agreement by challenging either the valuation or characterization of the covenant. This court, in requiring an even more stringent standard than "strong proof" in such cases, enunciated the following rationale for holding the parties to their bargain unless that bargain is infected with fundamental error:
 
 
 17
 "We begin by noting that the determination as to whether a covenant not to compete was actually executed is important, taxwise, both to the buyer and the seller. . . . Indeed, the presumed tax consequences of the transaction may, as here, help to determine the total amount a purchaser is willing to pay for such a purchase. Therefore, to permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment. . . . And to go behind the agreement at the behest of a party may also permit a party to an admittedly valid agreement to use the tax laws to obtain relief from an unfavorable agreement.
 
 
 18
 "Of vital importance, such attacks would nullify the reasonably predictable tax consequences of the agreement to the other party thereto. . . . In the future buyers would be unwilling to pay sellers for tax savings so unlikely to materialize.
 
 
 19
 "Finally, this type of attack would cause the Commissioner considerable problems in the collection of taxes. The Commissioner would not be able to accept taxpayers' agreements at face value. He would be confronted with the necessity for litigation against both buyer and seller in order to collect taxes properly due. This is so because when the Commissioner tries to collect taxes from one party he may, as here, dispute the economic reality of his agreement. When the Commissioner turns to the other party, there will likely be the arguments that the first party, as here, received consideration for bearing the tax burden resulting from the sale and that the covenants did indeed have economic reality.
 
 
 20
 "For these reasons we adopt the following rule of law: a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc."
 
 
 21
 Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967.) Because this rationale, common to Danielson and the 'strong proof' cases, is not germane to the facts of this case, neither the Danielson[38] rule nor the 'strong proff' rule determines the appellants' burdens here.[39]
 
 
 22
 In addition to finding that the appellants had failed to establish by strong proof that the agreed valuation did not represent the stock's fair market value for tax purposes, the Tax Court suggested that exceptional circumstances made the market price an inaccurate index of value in this case. 61 T.C. at 215. One of the circumstances the Tax Court identified was that "(o)nly 3,300 shares of White shares were traded on the date of sale . . . ." Id. However, that trading volume was in no way aberrational as compared with the daily volume throughout 1960, see Exhibit 17-M, and therefore provides no ground to reject the stock market price as an accurate value index. See Richardson v. Commissioner, 151 F.2d 102 (2d Cir. 1945), cert. denied, 326 U.S. 796, 66 S.Ct. 490, 90 L.Ed. 485 (1946). The Tax Court also observed that "the trading price (on October 31, 1960) . . . was the lowest price at which the stock traded in 1960 and 1961." Id. That price, less than a point below the average selling price on several subsequent days, was not radically out of line with the average exchange quotations in the months immediately preceding the valuation date. There was, moreover, uncontroverted testimony that the market for White common on October 31, 1960, was not an aberrational one. The expert witnesses who testified on this point viewed the steady decline in the price of the stock after June 23 as part of an overall market downturn occasioned by the poor business climate in 1960 and aggravated by the approach of the Presidential election. N.T. 465; 485. In addition, "White was not having a good year, and they were bringing off a fairly large transaction that year (the Oliver acquisition) which added an element of uncertainty to the situation." N.T. 465. The uncontradicted evidence establishes that the market price on October 31, 1960, was not aberrational, either in terms of a range of contemporaneous quotations on White shares or in terms of the performance of the whole market. The mere fact that the October 31 value was the lowest quoted in 1960 was thus an insufficient basis for rejecting this market price as the fair market value of the stock.
 
 
 23
 Relying on Seas Shiping Co. supra,[40] the court noted that the market measure was inapposite because of the size of the block relative to the total exchange volume during 1960--655,000 shares as against 444,000. 61 T.C. at 211. In seas Shipping the size of the block was only one factor which led the court to reject the market price. 371 F.2d at 531-32. Moreover, in that case the block to be valued was almost twice as large as the annual market volume. In the present case, by contrast, the large size of the block is the only exceptional attribute of the stock exchanged for the assets.[41] Moreover, the blockage discount, see Part II infra, offers a suitable corrective for the fact that one-third more shares were received by Oliver than were traded on the exchange in 1960. Under these circumstances, we hold that the Tax Court erred in resorting to the 'barter-equation method' to fix the fair market value of the White stock. The correct course was to value the shares at the mean exchange price on October 31, 1960, allowing a discount for blockage, if relevant on these facts. In reversing, we emphasize that the weakness of the Tax Court holding is not confined to its reliance on distinguishable precedent. More fundamentally, the agreed valuation method adopted by the court creates difficulties which are avoided by using the stock exchange price as the primary basis for determining value.D. Difficulties created by adopting the agreed valuation as the measure of fair market value in this case
 
 1. Purpose of the Valuation
 
 24
 It is axiomatic that the same item may have different "value" for different purposes. LeVant v. Commissioner, supra at 442; Fiflis & Kripke, Accounting for Business Lawyers, 141 (1971). The Tax Court implicitly recognized this principle by finding both an agreement between the parties to value the stock at $48.50 per share, 61 T.C. at 206, and no discussion as to the accounting or tax value of the same stock. 61 T.C. at 192.[42] The effect of the Tax Court holding, however, is to equate these different values. We disagree with the Tax Court's conclusion that the parties' valuation of stock, reached for purposes of establishing the terms of payment for Oliver's assets, is determinative of the fair market value for tax purposes. There are certainly circumstances under which assigned and tax values can or must be equated. See, e. g., cases cited note 36, supra. Nevertheless, the difference in valuation purposes should render a court cautious in assuming value equivalency. The Tax Court exhibited no such caution.
 
 2. Difficulties in Valuation
 
 25
 The Second Circuit sustained the Tax Court's use of the barter-equation method for valuing the stock in Seas Shipping, supra, only because it was unable to find that method of valuation clearly erroneous under the circumstances. 371 F.2d at 529, 532.[43] The court cautioned that the barter-equation method ought to be used
 
 
 26
 ". . . only under certain limited conditions. . . . There are obvious dangers in evaluating the consideration involved in one side of a barter by determining the worth of the consideration on the other side. In the first place, the two sides of the barter may, for various reasons, not be equal in value. Secondly, the barter-equation method is in the nature of a bootstrap operation since there is usually no logical reason to start with one side rather than the other. . . . Thirdly, the evidence on the value of one side of a barter may be no more reliable than that on the value of the other side."
 
 
 27
 371 F.2d at 529-30.
 
 
 28
 These warning words are particularly apt in this case, where there was no evidence that the valuation of Oliver's assets by the parties was in any degree more sound than the market's valuation of White's shares.[44]
 
 II. BLOCKAGE DISCOUNT
 
 29
 The Tax Court's holding obviated the necessity for it to decide whether Hess was correct in arguing that the market price of $36.3125 should be adjusted by a blockage discount.[45] Hess reasserted this contention on appeal.
 
 
 30
 At oral argument, the Commissioner conceded that the proper valuation of the stock would entail discounting the relevant market price by a blockage factor. The Commissioner further acknowledged that the fair market value of the White common was that which the Internal Revenue Service expert had testified to at trial: $30.85 per share. We have considered White Farm's objection to allowing the blockage discount and reject it.[46] See Stewart's Estate, supra at 18-19, and other cases cited at pages 14-15, supra. There is thus no need to remand for a determination of the blockage discount issue.
 
 
 31
 For the foregoing reasons, the decision of the Tax Court will be reversed, with directions to that court to enter judgment consistent with this opinion.
 
 
 32
 JAMES HUNTER, III, Circuit Judge (concurring in part and dissenting in part):
 
 
 33
 Although I am in substantial agreement with the majority opinion, I cannot agree with the majority's substitution of its views for those of the tax court on the applicability of blockage. As a result, I must dissent from Part II of the opinion.
 
 
 34
 Whether the blockage effect is relevant to the value of a security in any given case is a question of fact, Commissioner v. Stewart's Estate, 153 F.2d 17 (3d Cir., 1946); Richardson v. Commissioner, 151 F.2d 102 (2d Cir., 1945); Helvering v. Maytag, 125 F.2d 55 (8th Cir., 1942).[1] As such, an appellate court may not disturb the findings of the trier of fact unless they are clearly erroneous. Grove v. First National Bank, 489 F.2d 512, 515 (3d Cir., 1972).
 
 
 35
 In the instant case the tax court did not treat the blockage issue extensively. Indeed, having accepted the $48.50 value set by the parties in the agreement, the tax court found no need to discuss the application of the blockage rule to the average exchange price of the White stock on the date of the transfer. The tax court did consider blockage, however, in the context of the $48.50 value. Its reluctance to apply blockage to the value of White's stock, though framed in terms of that $48.50 price, in my view, stems from an assessment of the facts relating to this transfer. Based on this factual assessment, the tax court determined that blockage was not applicable in the instant case. I cannot say that this determination was clearly erroneous. That this court's treatment of blockage occurs in the average exchange price context rather than in the $48.50 context does not, in my view, affect the correctness or the applicability of the factual assessments made by the tax court.
 
 
 36
 The majority, apparently viewing the application of the blockage discount as a question of law, summarily rejects the tax court's conclusion on the issue.[2] See supra at 89. I do not think that blockage follows as a matter of law from our ruling that the value of securities be determined from the average price of traded securities on a given day.
 
 
 37
 Blockage is merely one aspect of the operation of the stock market which adjusts the price of a stock to reflect the information available to the buying community. Where a transfer of shares has not been disclosed to the financial community, a price adjustment is especially appropriate. In the context of an undisclosed transfer, the market price of a security will likely decline with the release of information if only because of the uncertainty caused by a change in the status quo.
 
 
 38
 A blockage effect is also relevant where a large block of stock is offered on the market at one time. In this context, the excess supply of shares depresses the market price, resulting in an actual decline in market value. By analogy, when a simulation of a block transfer is used to value a security, a blockage discount is appropriate. 10 Mertens, Law of Federal Income Taxation, § 59.15 at 51 (1970).
 
 
 39
 The cases cited by the majority deal with valuation in which simulated transfers serve as the basis for valuation. In these estate and gift tax cases, the court theorizes about the value of the transferred shares. See dissenting opinion, cases cited at n. 2 supra and cases cited in majority opinion at 83-85. The financial community has received no information about a transfer of shares in the cited cases. As such, the uncertainty of the market's reaction to any large scale transfer has not affected the actual market price of the shares to be valued. A discount is applied when it can reasonably be assumed that if information had been released, the share price would have declined.
 
 
 40
 In addition, however, valuation in estate and gift tax cases often must be derived from a simulated transfer value since no public transfer is contemplated. If an actual block distribution has in fact taken place, the excess supply of shares would have depressed the market price. So, too, in the simulation, this blockage discount effect must be considered in valuing the block of shares.
 
 
 41
 Thus, it seems to me that there are at least two reasons for applying the blockage discount discounting for uncertainty and discounting for excess supply both of which are present in the estate and gift tax cases cited by the majority.
 
 
 42
 In the instant case, however, neither reason for applying the blockage discount is present. The parties to this transfer insured that the financial community was fully informed of this transfer by public announcements[3] and in fact the market price of the White shares declined as this information was digested by the buying community.[4] To apply a blockage rule when the market has already discounted the shares in reaction to the uncertainties involved in such a transfer is to impose a penalty. In effect, the majority has allowed these shares to be doubly discounted, once by the natural operation of market forces and a second time by the court's own action.[5]
 
 
 43
 In addition the other traditional reason for applying blockage is entirely absent in this case. Since an actual transfer had taken place, there was no need to simulate the effect of a block transfer or to speculate on the effect of dumping an excess number of shares onto the market. An alternate non-market method of transfer was selected so that the simulated blockage effect had no applicability.[6]
 
 
 44
 In determining that blockage was inappropriate, the tax court, in my view, weighed all of these factors. It is beyond the powers of this court to reassess the facts and to determine that the tax court erred in refusing to apply a blockage discount.
 
 
 45
 But the majority opinion is incorrect in yet another regard. The majority seems particularly persuaded by White Farm's decision not to present expert testimony on the appropriateness of blockage. See supra at 89 n. 46. Although the tax court might properly have drawn an adverse inference from White's failure to present expert testimony, it is not our function to credit the testimony of Hess' experts when the trier of fact did not. In fact, White Farms did subject Hess' expert to extensive cross-examination on the blockage issue. By categorically accepting the testimony of Hess' expert, the majority has usurped the position of the trier of fact, impliedly asserting that White's cross-examination did not in any way discredit the testimony of Hess' experts. I do not deem it appropriate for a court of appeals to make factual determinations which of necessity require us to hold that cross-examination was ineffective.
 
 
 46
 For these reasons I must dissent from the majority opinion. I do not feel that the amount of blockage is an issue before this Court. Since the tax court determined blockage inapplicable to the facts of this case, no remand, in my view, is necessary.
 
 
 
 [1]
 Hereinafter "Hess."
 
 
 [2]
 The decision in Docket No. 5842-70 assessed a deficiency for 1964 in the amount of $1,687,232.00. The decision in Docket No. 1367-71 assessed a deficiency for 1965 in the amount of $1,541,601.00. See note 3 infra. Hess is appellant in Nos. 74-1633 and 74-1634
 
 
 [3]
 61 T.C. 189 (1973). Docket Nos. 5842-70 and 1367-71, see note 2 supra, were consolidated with Docket NO. 4792-69, which involved White Farm's income tax liability. See note 5 infra. Since all three docketed cases grew out of single transaction, the Commissioner filed a motion to consolidate the cases. This motion was granted on May 19, 1970, resulting in a joint trial and one opinion covering all cases
 On March 28, 1974, Amerada Hess filed timely notices of appeal to the Third, Seventh and Eighth Circuits in Docket Nos. 5842-70 and 1367-71. On April 4, 1974, the Commissioner filed timely notices of appeal to the Third and Seventh Circuits in Docket No. 4792-69. Pursuant to 26 U.S.C. § 7482(b), the Commissioner and White Farm filed a stipulation on June 17, 1974, designating the venue of the Commissioner's appeal in the Third Circuit. The appeals of Amerada Hess to the Seventh and Eighth Circuits were dismissed on July 12 and July 1, respectively. On July 29, 1974, this court approved a stipulation entered by all three parties and allowed consolidation of the appeals for purposes of briefing, argument and decision. The Commissioner is appellant in No. 74-1635.
 
 
 [4]
 Hereinafter "White Farm."
 
 
 [5]
 The decision in Docket No. 4792-69 computed overpayments in the amounts of $425,702.20 (1960), $1,572,710.04 (1961), and $248,059.32 (1962)
 
 
 [6]
 Hereinafter "Oliver."
 
 
 [7]
 After the transaction which gave rise to the suit, Oliver (referred to by the Tax Court as "Old Oliver"), first changed its name to Cletrac Corporation and then, in 1962, merged with Hess, Inc. to form Hess Oil and Chemical Corporation. In 1969, yet another merger between Hess Oil and Chemical Corp. and Amerada Petroleum Corp. produced Amerada Hess Corp., the appellant in Nos. 74-1633 and 74-1634
 
 
 [8]
 Hereinafter "White."
 
 
 [9]
 After the acquisition of its assets and name by White, Oliver Corporation (referred to by the Tax Court as "New Oliver") was a wholly-owned subsidiary of White Motor. In 1969, New Oliver merged with Minneapolis Moline, Inc.; the surviving corporation was renamed White Farm Equipment Company. White Farm, the wholly-owned subsidiary of White, is appellee in No. 74-1635
 
 
 [10]
 The manufacture and marketing of farm equipment was Oliver's primary business at the time. See N.T. 194-95
 
 
 [11]
 In 1959, Oliver had "shaken hands" on an agreement for a share exchange with Studebaker-Packard. However, the Studebaker-Packard Board of Directors failed to approve the plan. Just before the negotiations with White began, Minneapolis Moline, another farm equipment manufacturer, proposed a purchase and lease of certain assets. Oliver pursued the White deal to the exclusion of Minneapolis Moline's offer, however. See Exhibit 15-K (Minutes of a Special Meeting of the Board of Directors of the Oliver Corporation, June 23, 1960)
 The reasons for Oliver's desire to sell were set forth in its proxy statement, Exhibit 18-N, as follows:
 "The Board of Directors of Oliver has been concerned over the Company's long-range prospects. Profits in recent years have not been satisfactory. Earnings in 1959 were slightly under 5% of net worth. Dividends in 1959 were slightly under 2% of net worth. The common stock of Oliver has been selling at a substantial discount under the Stockholders' Investment (net worth or book value). . . .
 "The process of improving profit levels of Oliver is a lengthy task. In recent years, Oliver has discontinued or combined several operations in order to eliminate losses, improve efficiency, and release capital. . . .
 "As an alternative, the Board of Directors has sought to merge Oliver with another company, or to sell its business to another company in order to obtain the benefits of the greater efficiency inherent in integrated manufacturing and of an expanded sales organization. In recent years there have been lengthy negotiations with several companies, looking toward merger or sale."
 
 
 [12]
 See N.T. 193. White was not to acquire Oliver's cash, accounts receivable, or liabilities, although eventually a very small proportion of Oliver's liabilities was assumed. See N.T. 197. The payment of some cash "boot" was contemplated
 
 
 [13]
 On June 17, 1960, White submitted its first formal proposal for purchasing "all the tangible assets of The Oliver Corporation . . . held or used in connection with their farm equipment business . . .." Exhibit 11. Because Oliver's inventory was constantly changing, no dollar amount could be fixed as the purchase price before October 31, 1960, the designated closing date. Therefore, the proposal set forth a formula, based on the book value of the assets to be acquired, for computing the price White would pay for the business. "The purchase price is to be an amount equal to the aggregate sum of the book value (after depreciation) of the fixed assets to be sold plus the book value (on the LIFO basis and after deducting the reserve for obsolescence) of the inventory to be sold, less 20%, of the aggregate sum of the book value of said fixed assets and of said inventory determined as aforesaid." Exhibit 11. The price would be computed on the closing date and would be paid "(a) by the delivery of five hundred thousand (500,000) shares of Common Stock of The White Motor Company, to be considered as having a value of Twenty-five Million Dollars ($25,000,000), and (b) the balance of the purchase price . . . (would) be paid in cash or in debentures at par . . . ." Id. White thus valued its shares at $50.00 per share
 Oliver's Board of Directors considered this proposal at its meeting on June 23, 1960. The Board was favorably disposed toward dealing with White, but suggested a change in both the number and the value of the shares offered by White, as shown by this Resolution adopted that date:
 "Resolved, that Alva W. Phelps and A. L. Mailman be, and they hereby are, authorized to continue negotiations with The White Motor Company for the sale of certain assets of the Company to The White Motor Company on the basis of the letter dated June 17, 1960, from J. P. Dragin, Executive Vice President of The White Motor Company, to A. L. Mailman, except that instead of a portion of the purchase price being paid by 500,000 shares of The White Motor Company common stock valued at $50 per share, a portion shall be paid by one share of The White Motor Company's common stock for each five shares of The Oliver Corporation's outstanding Common Stock (including that under option), which payment shall be valued on the basis of the closing market price of The White Motor Company stock on June 23, 1960."
 No serious attempt to effect the five-for-one stock distribution was made by A. L. Mailman, Oliver's chief negotiator, on Oliver's behalf and it was deleted from the final agreement. N.T. 261. Oliver would accept White shares valued, not at $50.00 per share, but at $48.50 per share, the June 23, 1960, closing price of White common on the New York Stock Exchange. White agreed to the change in valuation.
 Due to difficulties which White encountered in obtaining sufficient funds to secure the $20,000,000. of working capital needed for the farm equipment business and to pay the cash "boot" for the acquisition, the number of shares to be received by Oliver was subsequently increased to 655,000. The assigned valuation of $48.50 per share was unchanged, however, even though the stock exchange price of White common had fallen several points since June 23, 1960. See Exhibits 17-M; 18-N.
 
 
 [14]
 "14. The Oliver Corporation agrees that it will cause a meeting of its shareholders to be duly called, which will be held not later than October 31, 1960, . . . . Said meeting shall be called and held for the purpose of acting upon a proposal to approve and authorize this Agreement and the sale to the White Company of properties and assets of The Oliver Corporation as in this Agreement set forth, for the consideration and upon the terms and conditions in this Agreement provided . . . and The Oliver Corporation agrees that its Board of Directors will do all things necessary or proper on its part to be done to authorize and provide for the carrying out of the provisions of this Agreement and that affirmative action by its shareholders on said proposal will be recommended to its shareholders by its Board of Directors
 "15. The White Company agrees that it will cause a meeting of its shareholders to be duly called, which will be held not later than October 31, 1960 . . .. Said meeting shall be called and held for the purpose of acting upon a proposal to approve this Agreement and the purchase by the White Company of properties and assets of The Oliver Corporation as in this Agreement set forth, for the consideration and upon the terms and conditions in this Agreement provided, and the White Company agrees that its Board of Directors will do all things necessary or proper on the part of the White Company to be done to authorize and provide for the carrying out of the provisions of this Agreement, and that affirmative action by its shareholders on said proposal will be recommended to its shareholders by its Board of Directors."
 White Motor Company Proxy Statement, Exhibit 19-O.
 
 
 [15]
 See note 12, supra. White also acquired Oliver's two foreign subsidiaries, Oliver International, S. A., and The Oliver Corporation, Argentina, S. A
 
 
 [16]
 "7. Subject to the conditions in this Agreement set forth, the White Company agrees to pay to The Oliver Corporation for all of the properties and assets hereinabove described . . . a sum which is equal to the sum of fifty per cent (50%) of the book value, at the close of business on the Closing Date, of the closed South Bend Foundry, plus eighty per cent (80%) of the book value, at the close of business on the Closing Date, of the inventories and, except the closed South Bend Foundry, of the land, land improvements, buildings and improvements, railroad sidings, machinery and equipment, furniture and fixtures, dies, jigs, fixtures, material handling equipment, patterns, flasks, automobiles, trucks, tractors and other additions in process, purchased by the White Company from The Oliver Corporation under the provisions of this Agreement. The book value at the close of business on the Closing Date, of the property in the preceding sentence described shall be determined in the same manner and by the same accounting methods in all respects, including the LIFO method of taking and pricing inventories and the methods of allowances for obsolescence and depreciation (not including the Reserve for Losses on Fixed Assets in Closed Plants) of fixed assets, as were used and reflected in the 'Consolidated Statement of Financial Position' of The Oliver Corporation and subsidiaries, as of October 31, 1959, which was certified by Arthur Andersen & Co. and included in the '1959 Annual Report' of The Oliver Corporation (except that certain items of consigned inventory may be transferred to trade receivables through note settlements)
 "8. The purchase price hereinabove provided for in paragraph 7 shall be paid as follows: The sum of Thirty-one Million Seven Hundred Sixty-seven Thousand Five Hundred Dollars ($31,767,500) shall be paid by the White Company by the delivery, on the Closing Date, to The Cleveland Trust Company, of Cleveland, Ohio, of certificates for six hundred fifty-five thousand (655,000) shares of the Common Stock of the White Company, made out and registered in the name of said The Cleveland Trust Company, or its nominee, to be held and disposed of by said Trust Company as provided in the Trust Agreement . . .. As soon as practicable after the Closing Date, the purchase price of the properties and assets . . . at the close of business on the Closing Date, shall be computed in the manner hereinabove . . . provided, and thereupon the White Company shall forthwith pay to The Oliver Corporation the unpaid balance, if any, of said purchase price, as so computed, by check payable to the order of The Oliver Corporation. If the said computation shall show that the purchase price is less than Thirty-one Million Seven Hundred Sixty-seven Thousand Five Hundred Dollars ($31,767,500), The Oliver Corporation shall forthwith pay to the White Company by The Oliver Corporation's check the difference between the said purchase price and the said sum of Thirty-one Million Seven Hundred Sixty-seven Thousand Five Hundred Dollars ($31,767,500)."
 Id.
 
 
 [17]
 Indeed, there were indications in both companies' proxy statements that the $48.50 valuation was not meant to control for tax or accounting purposes. As J. P. Dragin, White's chief negotiator, recognized in his trial testimony, N.T. 75, the notes to the pro forma balance sheet included in White's proxy materials implied that the market value on the closing date would control for accounting purposes:
 "NOTE C The pro forma adjustments are as follows:
 "(2) These amounts represent the excess of Oliver book value over White acquisition cost. The amount of excess will be adjusted for the difference between the assigned value of $48.50 per share of White common stock and its market value on the closing date.
 "(3) Issuance of 655,000 shares of common stock at an assigned value of $48.50 per share, or an aggregate of $31,767,500, of which the sum of $1.00 per share is credited to the Common Stock Account and the sum of $47.50 per share is credited to Capital in Excess of Par Value of Capital Stock. The aggregate credit to Capital in Excess of Par Value of Capital Stock of $31,112,500 is subject to a decrease or an increase in the same amount as the adjustment to the excess referred to in Note C(2) above."
 Exhibit 19-O, Note C, at page 20. The Oliver proxy materials also indicated that the market price on the closing date would control for tax purposes:
 "Among other things, they are subject to variations in inventories (including inventories to be sold to White), trade receivables, bank debt, other items, profit or loss for the period from July 31, 1960, to October 31, 1960, tax adjustments which may arise from the difference between the assigned value of $48.50 per share of White common stock and its fair value on the Closing Date, and matters which are not foreseen by the Directors at this time. A decline in the value of the White common stock prior to the Closing Date will increase the loss on the sale. This increase in loss would amount to $4,912,500 if that value were the closing market price of White common stock on September 26, 1960. In addition, as indicated on page 4, the Closing Date may be a date later than October 31, 1960. Oliver makes no representation as to what the market value of White common stock will be at the Closing Date.
 "(1) In October, 1960, the Company entered into an agreement with The White Motor Company providing for the sale of the farm equipment business and certain related assets of Oliver to White. Under the terms of the agreement, the assets of Oliver to be sold would be exchanged for 655,000 shares of the common stock of White at an assigned value of $31,767,500, and for cash estimated at $9,045,000 depending on the book value of the assets at the closing date. The aggregate market value of White common stock to be issued was $4,912,500 less than the assigned value thereof based on the closing price of White stock on the New York Stock Exchange on September 26, 1960.
 "Based upon the table on page 7, prepared by the Company, the net book value as of July 31, 1960, of the assets to be sold ($51,410,000) exceeds the sum of the estimated cash and the market value of the 655,000 shares of White stock to be received. As discussed on page 8, the ultimate loss on the transaction is dependent upon the book value of the assets to be sold, the Federal income tax status of the company and the fair value of White common stock at the closing date, which is expected to be October 31, 1960, and the determination of reserve adjustments that may be required at that date. No recognition has been given in the accompanying consolidated financial statements and the summary of consolidated earnings to this potential loss on sale of assets."
 
 
 [18]
 Distribution to Oliver shareholders was dependent upon Oliver's receiving an Internal Revenue Service ruling to the effect that such a distribution would be taxed to the shareholders as a capital gain or loss, rather than as an ordinary dividend. The ruling was received and distribution of White stock to Oliver's shareholders began on July 31, 1961. The Tax Court found that "approximately 653,770 shares of the block of 655,000 shares were either distributed directly to the Old Oliver shareholders or sold on the market and the proceeds made available to the shareholders. The remainder . . . was held by Old Oliver as an investment." 61 T.C. at 205
 
 
 [19]
 The 10,000 share restriction was included to prevent any one individual from buying a sufficient number of shares to obtain working control of White. The 655,000 shares acquired by Oliver represented 23.7 per cent. of White's outstanding stock
 During the time the trustee held the shares pending distribution, the stock was to be voted pro rata according to the instructions of Oliver's shareholders. Oliver's directors had no power to vote as a block the shares held by the trustee.
 
 
 [20]
 See note 12, supra
 
 
 [21]
 See N.T. 89, 91; 61 T.C. at 204
 
 
 [22]
 As a result of shareholder ratification of the agreement, Oliver's name was changed to Cletrac Corporation on October 31
 
 
 [23]
 These returns were actually filed by White's farm equipment subsidiary, which eventually became White Farm. See note 9, supra
 
 
 [24]
 See note 9, supra. The deficiency was actually assessed against Oliver Corporation, but the case caption was amended when Oliver became White Farm
 
 
 [25]
 See note 7, supra
 
 
 [26]
 White Farm's predecessor, Oliver, filed its petition appealing from the Commissioner's assertion of a deficiency in its tax on September 22, 1969. Amerada Hess filed its petition on September 8, 1970
 
 
 [27]
 See note 3, supra
 
 
 [28]
 But see Seas Shipping Co. v. Commissioner, 371 F.2d 528, 529 (2d Cir.), cert. denied, 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967)
 
 
 [29]
 There is no dispute that the correct valuation date is October 31, 1960
 
 
 [30]
 "Intrinsic value" refers to a valuation based on the underlying assets and earnings of a business. "Book value" is a type of intrinsic value. According to the "barter-equation" approach, the value of property given up in an exchange is computed by equating it to the value of the property received in the same exchange
 
 
 [31]
 The market may also be an inappropriate measure because the type of stock traded on the exchange differs from the type traded by the parties to the particular transaction. In Ray, etc., Copper Co. v. United States, 268 U.S. 373, 45 S.Ct. 526, 69 L.Ed. 1003 (1925), the Court held that it was not error to use the value of corporate assets rather than the market to fix the value of capital stock, since "(t)he capital stock of a corporation . . . and its shares of stock are entirely different things. The value of one bears no fixed or necessary relation to the value of the other." Id. at 377, 45 S.Ct. at 528 (citations omitted)
 
 
 [32]
 In such a situation, the market price is enhanced by a "control premium."
 
 
 [33]
 Selling off a very large block of shares which are identical to all other such shares available on the market creates a supply in excess of demand. It is widely accepted that the market quotation of such shares should be reduced to compensate for this price-depressing effect. The reduction is referred to as a "blockage discount."
 
 
 [34]
 In Strong v. Rogers, this court held that the "wild and unreasonable" market prices during 1927-1929 did not conclusively establish the correct income tax valuation, as they failed to fix a "fair" market value. This view has been disapproved by the commentators. See Porter, supra at 283; Bonbright, supra at 1022
 
 
 [35]
 The Tax Court cites "W. E. Telling Est., a Memorandum Opinion of this Court dated June 28, 1944, where the Court held that negotiations for the sale of stock at a price in excess of the stock's trading price on the Cleveland Exchange controlled the fair market value of the stock for estate tax purposes." Whatever other distinctions may exist between Telling and the present case, it suffices to observe that "memorandum decisions . . . are not generally cited as authorities by the Tax Court or other courts, and are intended to involved questions turning on fact issues or previously decided points." Surrey, Warren, McDaniel and Ault, Federal Income Taxation, Vol. I, 64 (1972). Moreover, Richard E. Wiles, Jr., 60 T.C. 56, 63 (en banc) (1973), aff'd on other grounds, 499 F.2d 255 (10th Cir. 1974), cert. denied, 419 U.S. 996, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974), rejected the argument, which was raised by the Commissioner in that case, that the agreed values for stock should be used to compute the amount realized. In Wiles, the Tax Court clearly took the position that "we cannot subscribe to the suggestion that petitioner and (his wife) could have valued those stocks more accurately than the highly organized markets in which they are traded daily. Indeed, cases cited by the Commissioner state that the fair market value of a publicly traded stock is the average of the market high and low upon transfer."
 
 
 [36]
 See, e. g., Ray etc., Copper Co. v. United States, 268 U.S. 373, 45 S.Ct. 526, 69 L.Ed. 1003 (1925), cited at 61 T.C. 214 (capital stock having no market); Bar L Ranch, Inc. v. Phinney, 426 F.2d 995 (5th Cir. 1970), cited at 61 T.C. 213 (valuation of notes or accounts receivable of an insolvent obligor, there being no market for such paper); Ullmann v. Commissioner, 264 F.2d 305 (2d Cir. 1959), cited at 61 T.C. 209 (involving the characterization and valuation of a covenant not to compete a commodity also lacking a market on the exchange or over the counter); Glen W. Lucas, Jr., 58 T.C. 1022 (1972); Edmond E. Maseeh, 52 T.C. 18 (1969), cited at 61 T.C. 211 (also involving covenants not to compete); Southern Natural Gas Co. v. United States, 412 F.2d 1222, 188 Ct.Cl. 302 (1969), cited at 61 T.C. 208 ("The preferred stock in question was newly issued and was neither listed on any exchange nor traded over the counter. Such private sales as had occurred were insignificant. Accordingly, it had no established or readily ascertainable market value or price . . . other than the value assigned to the shares by the contracting parties."), 412 F.2d at 1250-51
 
 
 [37]
 Authority for this proposition is Judge Friendly's concurrence in Seas Shipping Co. v. Commissioner, 371 F.2d 528 (2d Cir.), cert. denied, 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967), which is distinguishable because the parties' agreed price was, in that case, also found reasonable by the Maritime Commission. In Estate of Rogers v. Commissioner, 445 F.2d 1020 (2d Cir. 1971), also relied on by the Tax Court, the question was the fair market value of real estate and of a mortgage on real estate items with no clear market such as that for fungible goods
 
 
 [38]
 The Danielson court also implied that a valuation agreement could be freely attacked by the Commissioner an implication which runs counter to the Tax Court's reasoning in the present case
 "Next, we are not here involved with a situation where the Commissioner is attacking the transaction in the form selected by the parties, . . . . Where the Commissioner attacks the formal agreement the Court involved is required to examine the 'substance' and not merely the 'form' of the transaction. This is so for the very good reason that the legitimate operation of the tax laws is not to be frustrated by forced adherence to the mere form in which the parties may choose to reflect their transaction. . . . In contrast, the Commissioner here is attempting to hold a party to his agreement unless that party can show in effect that it is not truly the agreement of the parties. And to allow the Commissioner alone to pierce formal arrangements does not involve any disparity of treatment because taxpayers have it within their own control to choose in the first place whatever arrangements they care to make."
 378 F.2d at 774-75 (citations omitted). The Tax Court, finding that appellants had failed to meet the looser "strong proof" standard, did not decide whether Danielson applied. 61 T.C. at 211.
 
 
 [39]
 As justification for its use of both the "strong proof" standard and the "barter-equation method" of valuation, the Tax Court relied primarily on Seas Shipping Co., supra. In Seas Shipping, the Second Circuit, reluctantly, affirmed the Tax Court's use of the barter-equation method to value shares of Moore-McCormack Lines (Mooremac) which were traded on the New York Stock Exchange. Seas Shipping is, however, distinguishable from the case now before this court in several significant respects
 At the time the parties agreed to value the Mooremac stock at $30.00 per share, the exchange price of the stock was approximately $23.00 per share. Although the block of 300,000 shares comprised "a 13% ownership in a successful corporation and was the largest block held by any Mooremac shareholder," the block "did not represent a controlling interest." 371 F.2d at 530. However, as part of the deal, Seas Shipping executed "a contemporaneous voting trust agreement . . . with certain Mooremac shareholders by which (Seas) received control of two directorships on Mooremac's board of ten for a period of five years . . . ." Id. This agreement was found by the Tax Court to enhance the value of the shares Seas acquired; the court of appeals saw this factor as a mere make-weight. Other factors considered by the court to support the $30.00 per share agreed value were (1) "Mooremac had agreed to continue, under the same name, the shipping line previously operated by (Seas) and to hire certain of (Seas) employees," 371 F.2d at 530; (2) "the book value of Mooremac shares during 1957 was in excess of $39," id.; (3) "the annual market of 166,000 shares was too 'thin' to fix the value of a block of 300,000 shares," id.; (4) "testimony concerning the value of the ships was ample and convincing," 371 F.2d at 532; (5) "the Maritime Board in its approval of the sale of the ships, stated that the value of the stock was $30 per share," 371 F.2d at 531. This latter consideration was accorded weight by Judge Friendly in his concurrence at 371 F.2d 533. By contrast, the Tax Court in the present case relied almost entirely on the parties' evaluation. Of the factors which supported the validity of the agreed share price in Seas Shipping, only the thinness of the market arguably applies in the present case and this cannot be, alone, determinative. See p. 21, infra. In particular, the testimony as to asset value in this case cannot be characterized as either ample or convincing, as it was in Seas Shipping. See note 44, infra.
 
 
 [40]
 See note 39, supra
 
 
 [41]
 The only effect of the restriction as to the number of shares that might be sold to a single purchaser was to negate any control possibilities. See note 19, supra. This restriction does not, therefore, qualify as an "exceptional" attribute
 
 
 [42]
 Both findings are unimpeachable under the "clearly erroneous" rule. See Commissioner v. Duberstein, 363 U.S. 278, 289-91, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960)
 
 
 [43]
 See Part I-A, supra
 
 
 [44]
 In fact, there was evidence that strongly implied the opposite. The aggregate book value of the assets was $42,905,763.00
 Purchase Price
 Computed in
 Accordance
 with Paragraph
 Old Oliver's 7 of
 Book Value the October
 at October 3,1960
 "Assets Aquired 31,1960 Agreement
------------------ ------------ --------------
1. Real estate on
 plants were
 located. $ 3,698,551 $ 2,958,840
2. Machinery and
 equipment in
 the plants. $ 7,755,727 $ 6,182,976
3. Real estate on
 which branches
 were located. $ 2,861,343 $ 2,207,120
4. Machinery and
 equipment in
 the branches. $ 479,462 $ 383,570
5. Tooling. $ 3,905,740 $ 3,124,593
6. Inventory. $23,777,820 $19,022,256
 ------------ --------------
Subtotal $42,478,643 $33,879,355
Prepaid Expenses $ 427,120 $ 336,091
 ------------ --------------
TOTAL $42,905,763 $34,215,446"
 ------------ --------------
 Statement of John Peter Dragin, p. 6, Tax Ct. Docket Nos. 4792-69 and 5842-70.
 The purchase price computed according to paragraph 7 of the October 3, 1960, agreement, see note 16, supra, was $34,215,446. Kriser, who appraised some of the assets for White, attached to the real estate, plants, and equipment a "liquidating value" price. Kriser's statement noted that " 'liquidating value' is to be distinguished from 'fair market value.' . . . Liquidating value is similar to fair market value, except that a reasonable time to find a purchaser is not allowed. It generally restricts the class of buyers to spontaneous buyers those who would attend an auction sale and buy on the spot, after only a short period of inspection or thought." Statement of Sidney P. Kriser, Tax Court Docket Nos. 4792-69 & 5842-70, at 5.
 J. P. Dragin, who also inspected the same assets, averred that, in his experience, "fair market values (of real estate) were higher than book values due to increasing costs and rising real estate values." Statement of John Peter Dragin, Tax Court Docket Nos. 4792-69 & 5842-70, pp. 9, 7. He also admitted that he had made no "effort to inspect and appraise the branch machinery and equipment to the extent we did the other assets" because the agreed purchase price of $383,570.00 "was minor in relation to the total transaction." Id. at 9. Dragin also stated that the book value of the tooling, which was in excess of the agreed purchase price, was "conservative and considerable amounts of tooling having no book value could still be used in production and would have substantial value . . . ." Id. at 11. The inventory, for which White agreed to pay $19 million, had a book value of approximately $24 million. Dragin found its replacement value to be approximately $32 million. These examples of the diverse views of, and approaches to, the value of these various assets underscore the complexity of asset valuation. They also raise questions as to the solidity of the basis for the Tax Court's conclusion that "the value assigned in the . . . agreement . . . constitutes a much more reliable measure of the value of those shares" than the market place. 61 T.C. at 215.
 
 
 [45]
 Even though the Tax Court did not have to decide the issue, it appeared to disagree that the blockage discount and the values assigned that discount by the experts' testimony were relevant in this case. See 61 T.C. at 215-16
 
 
 [46]
 Although the Tax Court expressed doubt as to the validity of the experts' methods of computing the discount, there was no contradictory testimony to discredit these valuations by several experts who reached very similar conclusions. See N.T. 342, 346-47; 349; 357-59; 443, 447-48; 453-65; 472-80, 492-502
 
 
 [1]
 The majority seems to hold that the applicability of blockage is a question of law which necessarily follows from our holding in Part I of this opinion. In turn, the majority concludes that the amount of blockage is a question of fact. Because White failed to offer any expert testimony, the majority accepts Hess' testimony on this fact
 In my view, both the applicability of and the amount of blockage are factual questions. The applicability of blockage does not necessarily follow from our holding in Part I. The tax court made a factual determination that blockage was inappropriate on the facts of this case. Thus, the issue of the appropriate amount of blockage, which is all that the majority addresses, was not reached by the tax court and should not be reached by us.
 
 
 [2]
 In my view, the cases cited by the majority do not hold that the applicability of blockage is a question of law. In Commissioner v. Stewart's Estate, 153 F.2d 17 (3d Cir., 1946), decedent Stewart held a block of stock which was valued at the market price on the date of death. Under treasury regulations prevailing at the time, the tax court could and in fact did consider "other relevant facts and elements of value." (emphasis added.) 153 F.2d at 19, including a discount for blockage. In affirming, this court held that the tax court "did not err when it found 'fair market value' by weighing all relevant indicia of what the stocks would bring at market." (emphasis added) 153 F.2d at 19. Determination of what factors are relevant to valuation are peculiarly factual. Stewart's Estate in no way holds that blockage is required as a matter of law whenever market price is used to value a block of securities
 Similarly in Richardson v. Commissioner, 151 F.2d 102 (2d Cir., 1945) the Second Circuit affirmed the tax court's determination that a blockage discount was inappropriate. The court stated:
 . . . Surely the Tax Court, if not convinced by the evidence, was not obliged to accept the conclusions expressed by the petitioner's experts. . . . Nor are we at liberty to disturb the ultimate finding merely because an independent appraisal of the evidence might have led us to some different finding of the underlying facts and factors. 151 F.2d at 104 (citations deleted).
 Once again the factual nature of the tax court's decision whether or not to apply blockage is evidenced.
 In Helvering v. Maytag, 125 F.2d 55 (9th Cir., 1942) the tax court stated "the size of a block of listed stock (is only one) . . . factor to be considered (for) . . . valuation for gift or estate tax purposes." 151 F.2d at 62-63. With this language, the court approved the tax court's application of a blockage discount for estate tax purposes. Once again, however, the conclusion is inescapable that the applicability of blockage in a given case hinges on factual determinations.
 
 
 [3]
 A press release containing financial data about the proposed transfer was released on October 6, 1960, at least three weeks before the actual exchange took place on October 31. See Appendix at 632
 
 
 [4]
 The White stock declined nine percent between the New York Stock Exchange closing of 401/4 on the day of the press release, October 6 and the day of the actual exchange. October 31, when the stock closed at 365/8. The decrease in the New York Stock Exchange price paralleled the release of information to the public. By the date of the actual exchange, the financial community had digested this information and the share price began to rise shortly thereafter. Thus, it was possible for the tax court to have found that discounting had already occurred with the release of information on the proposed exchange
 It is interesting to note that the actual pattern of price change of the White stock during the relevant period closely resembles the price activity suggested by Hess' experts as the basis for blockage discount. For example, there was testimony that the simple average price decline (adjusted for market factors) of three large New York Stock Exchange secondary distributions during 1960 was 12.3 percent during the 2-5 weeks between the day before registration and the day of the offering. See Appendix at 323-26, 511-19.
 The similarity between the simulated discount suggested by the experts and the actual decrease in share price which occurred with the release of information is in striking support of my view that to apply a blockage discount in this case is to engage in double counting.
 
 
 [5]
 See n. 4 supra
 
 
 [6]
 In Seas Shipping Co., Inc. v. Commissioner, 371 F.2d 528, 530 n. 3 (2d Cir., 1967), the court implied that a blockage discount could have no applicability where an actual non-market rather than a simulated market transfer was utilized for valuation purposes. Although the language in Seas Shipping is dicta since the case specifically values the shares by a barter exchange method, I deem the court's logic relevant and persuasive